**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

FIONA HAVLISH as Personal Representative of
the ESTATE OF DONALD G. HAVLISH, JR.;
FIONA HAVLISH; WILLIAM P. HAVLISH as
Personal Representative of the ESTATE OF
DONALD G. HAVLISH, SR.; WILLIAM
HAVLISH; NATHAN CONKLIN as Personal
Representative of the ESTATE OF SUSAN
CONKLIN; RUSSA STEINER as Personal
Representative of the ESTATE OF WILLIAM R.
STEINER; RUSSA STEINER; CLARA
CHIRCHIRILLO as Personal Representative of
the ESTATE OF PETER CHIRCHIRILLO;
CLARA CHIRCHIRILLO; LIVIA
CHIRCHIRILLO; CATHERINE DEBLIECK;
TARA BANE as Personal Representative of the
ESTATE OF MICHAEL A. BANE; TARA BANE;
ARLINE PEABODY-BANE as Personal
Representative of the ESTATE OF JACK
DONALD BANE;  CHRISTINA BANE-HAYES;
JANE HALLER as Personal Representative of the
ESTATE OF WILLIAM GODSHALK; JANE
HALLER as Personal Representative of the
ESTATE OF GRACE PARKINSON GODSHALK;
ELLEN SARACINI as Personal Representative
of the ESTATE OF VICTOR SARACINI; ELLEN
SARACINI; JOANNE RENZI as Personal
Representative of the ESTATE OF ANNE C.
SARACINI; JOANNE RENZI; THERESANNE
LOSTRANGIO as Personal Representative of the
ESTATE OF JOSEPH LOSTRANGIO;
THERESANNE LOSTRANGIO; KAREN
BINGHAM as Personal Representative of the
ESTATE OF GERALD BINGHAM; JULIA
BORYCZEWSKI as Personal Representative of
the ESTATE OF MARTIN BORYCZEWSKI;
JULIA BORYCZEWSKI as Personal
Representative of the ESTATE OF KRYSTYNA

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Judgment Creditors in:

*Havlish v. bin Laden*

1:03-md-01570; 1:03-cv-09848

1:26-cv- _____

AMENDED COMPLAINT

BORYCZEWSKI; JULIA BORYCZEWSKI as      :
Personal Representative of the ESTATE OF      :
MICHAEL BORYCZEWSKI; JULIA      :
BORYCZEWSKI; MICHELE BORYCZEWSKI      :
GRACE KNESKI as Personal Representative of the :
ESTATE OF STEVEN CAFIERO; GRACE      :
KNESKI; RICHARD A. CAPRONI as Personal      :
Representative of the ESTATE OF RICHARD M.      :
CAPRONI; CHRISTOPHER CAPRONI;      :
DOLORES CAPRONI; LISA CAPRONI-BROWN;:
MICHAEL CAPRONI; RICHARD A. CAPRONI      :
ALICE CARPENETO; LESLIE COALE BROWN      :
as Personal Representative of the ESTATE OF      :
JEFFREY COALE; LESLIE COALE BROWN as      :
Personal Representative of the ESTATE OF      :
WILLIAM COALE; FRANCIS M. COFFEY as      :
Personal Representative of the ESTATE OF      :
DANIEL M. COFFEY; FRANCES M. COFFEY;      :
DANIEL D. COFFEY, M.D.; KEVIN M. COFFEY :
FRANCIS M. COFFEY as Personal Representative :
of the ESTATE OF JASON COFFEY; KEITH      :
BRADKOWSKI as Personal Representative of the  :
ESTATE OF JEFFREY COLLMAN; KATHRYN      :
E. COLLMAN as Personal Representative of the      :
ESTATE OF DWAYNE W. COLLMAN; ESTATE :
OF BRIAN COLLMAN; CHARLES COLLMAN;      :
BRENDA MARTIN; LOISANNE DIEHL as      :
Personal Representative of the ESTATE OF      :
MICHAEL DIEHL; LOISANNE DIEHL;      :
MICHELLE DORF WALMACH and LINDA      :
SAMMUT as co-Personal Representatives of the      :
ESTATE OF STEPHEN DORF; MICHELLE      :
DORF as Personal Representative of the ESTATE  :
OF ANN MARIE DORF; TARA DORF as      :
Personal Representative of the ESTATE OF      :
JOSEPH DORF; MICHELLE DORF WALMACH; :
MICHELLE DORF WALMACH and LINDA      :
SAMMUT as co-Personal Representatives of the      :
ESTATE OF MORRIS DORF; ROBERT DORF;      :
LINDA SAMMUT; CORAZON FERNANDEZ      :

2

as Personal Representative of the ESTATE OF        :
JUDY  FERNANDEZ; CORAZON FERNANDEZ; :
REGINA MARIA MERWIN as Personal                   :
Representative of the ESTATE OF RONALD             :
GAMBOA; REGINA MARIA MERWIN;                      :
TINA GRAZIOSO as Personal Representative of        :
the ESTATE OF JOHN GRAZIOSO; TINA                 :
GRAZIOSO; JIN LIU as Personal Representative       :
of the ESTATE OF LIMING GU JIN LIU; ALAN          :
GU; MAUREEN HALVORSON as Personal                 :
Representative of the ESTATE OF JAMES D.           :
HALVORSON; MAUREEN HALVORSON;                     :
HAOMIN JIAN a/k/a ALEX JIAN; FUMEI CHIEN:
HUANG; HUICHUN JIAN; HUI-CHUAN JIAN;              :
HUI-CHIEN CHEN; HUI-ZON JIAN; PAUL                :
LAVELLE as Personal Representative of the          :
ESTATE OF DENIS LAVELLE; LUKE                     :
RICHARD PAPROCKI as Personal Representative :
of the Estate of MARIE ANN PAPROCKI;              :
STEPHANIE GIGLIO as Personal Representative        :
of the ESTATE OF ROBERT LEVINE;                   :
STEPHANIE GIGLIO as Personal Representative        :
of the ESTATE OF RONI LEVINE;                     :
MICHAEL LOGUIDICE, SR; BETTE MAERZ               :
as Personal Representative of the ESTATE OF         :
RALPH S. MAERZ, JR.; MARGARET MAURO              :
as Personal Representative of the ESTATE OF         :
DOROTHY MAURO ; MARGARET MAURO;                  :
RAMON MELENDEZ as Personal Representative :
of the ESTATE OF MARY MELENDEZ;                   :
RAMON MELENDEZ; PATRICIA MILANO as               :
Personal Representative of the ESTATE OF            :
PETER T. MILANO; PATRICIA MILANO;                 :
IVY MORENO as Personal Representative of           :
the ESTATE OF YVETTE NICOLE MORENO;              :
IVY MORENO; JOANNE LOVETT as Personal             :
Representative of the ESTATE OF BRIAN              :
NUNEZ; JOANNE LOVETT; DIANE                       :
OGNIBENE as co-Personal Representative  of the :
ESTATE OF PHILIP PAUL OGNIBENE;                   :

3

DIANE OGNIBENE as Personal Representative of    :
the ESTATE OF VINCENT A. OGNIBENE;              :
MARTINA PANIK-STANLEY as Personal              :
Representative of the ESTATE OF MARTIN          :
PANIK; MARTINA PANIK-STANLEY as                :
Personal Representative of the ESTATE OF        :
LINDA ELLEN PANIK; MARY LYNN-ANNA              :
"MARTINA" PANIK  STANLEY;                       :
CHRISTINE PAPASSO as Personal Representative    :
of the ESTATE OF SALVATORE T. PAPASSO;         :
CHRISTINE PAPASSO; JOEL R. PERRY as            :
Personal Representative of the ESTATE OF JOHN   :
WILLIAM PERRY; JOEL R. PERRY as Personal       :
Representative of the ESTATE OF PATRICIA J.     :
PERRY; RODNEY RATCHFORD as Personal            :
Representative of the ESTATE OF MARSHA          :
RATCHFORD; RODNEY RATCHFORD;                   :
RODNEY M. RATCHFORD; MARSHAE R.                :
RATCHFORD; MARANDA C. RATCHFORD;               :
JUDITH REISS as Personal Representative of      :
the ESTATE OF JOSHUA SCOTT REISS;              :
JUDITH REISS; JOYCE ANN RODAK as               :
Personal Representative of the ESTATE OF        :
JOHN M. RODAK; JOYCE ANN RODAK;                :
CHELSEA NICOLE RODAK PRIMAVERA;                :
DEVON MARIE RODAK LOVELL; JOHN                 :
RODAK; REGINA RODAK; JOANNE GORI;              :
DIANE ROMERO as Personal Representative of      :
the ESTATE OF ELVIN ROMERO; DIANE              :
ROMERO; HELEN ROSENTHAL; LOREN                 :
ROSENTHAL as Personal Representative of the     :
ESTATE OF RICHARD ROSENTHAL; LOREN             :
ROSENTHAL; RACHEL LOGAN as Personal            :
Representative of the ESTATE OF ALEXANDER       :
ROWE; ED RUSSIN; BARRY RUSSIN as               :
Personal Representative of the ESTATE OF        :
GLORIA RUSSIN; BARRY RUSSIN; VICTOR            :
SANTILLAN as Personal Representative of the     :
ESTATE OF MARIA THERESA SANTILLAN;             :
VICTOR SANTILLAN as Personal Representative     :

4

of the ESTATE OF EXPEDITO SANTILLAN;          :

VICTOR SANTILLAN as Personal Representative :

of the ESTATE OF ESTER SANTILLAN; PAUL     :

SCHERTZER as Personal Representative of the  :

ESTATE OF SCOTT SCHERTZER; PAUL           :

SCHERTZER; RONALD SLOAN as Personal       :

Representative of the ESTATE OF PAUL K.      :

SLOAN; RONALD S. SLOAN; RAYMOND          :

SMITH, JR. as Personal Representative of the   :

ESTATE OF GEORGE ERIC SMITH;             :

RAYMOND ALEXANDER SMITH;               :

KATHERINE SOULAS as Personal Representative :

of the ESTATE OF TIMOTHY P. SOULAS;        :

KATHERINE SOULAS; GEORGE               :

STERGIOPOULOS, M.D. and ANGELA          :

STERGIOPOULOS as co-Personal             :

Representatives of the ESTATE OF ANDREW    :

STERGIOPOULOS; GEORGE                 :

STERGIOPOULOS, M.D. ANGELA            :

STERGIOPOULOS; SANDRA STRAUB as        :

Personal Representative of the ESTATE OF      :

EDWARD W. STRAUB; SANDRA STRAUB;       :

JOAN E. TINO as Personal Representative of     :

the ESTATE OF JENNIFER TINO; JOAN E.       :

TINO; PAMELA SCHIELE; CHRISTINE         :

BARTON as Personal Representative of the      :

ESTATE OF JEANMARIE WALLENDORF;        :

CHRISTINE BARTON; CHRISLAN FULLER       :

MANUEL as Personal Representative of the      :

ESTATE OF META WALLER; MICHAEL         :

PAIGE as Personal Representative of the        :

ESTATE OF TIMOTHY RAYMOND WARD;       :

BRIANNA GOMES as Personal Representative   :

of the ESTATE OF DOYLE RAYMOND         :

WARD; MAUREEN HALVORSON;             :

STEPHEN L. CARTLEDGE; MICHELLE         :

WRIGHT; LEONARD ZEPLIN; LEONA          :

ZEPLIN; JOSLIN PARADISE               :

                                    :

------------------------------------------------------------------ x

5

----------------------------------------------------------------- x

CANDYCE S. HOGLAN as Personal Representative of the ESTATE OF MARK KENDALL BINGHAM; CANDYCE S. HOGLAN as Personal Representative of the ESTATE OF ALICE HOGLAN a/k/a HOAGLAND; KUI LIONG LEE as Personal Representative of the ESTATE OF SIEW NYA ANG; KUI LIONG LEE; WINNEE LEE; JEANEE LEE; ARLINE PEABODY-BANE; BRIAN MAJOR; BRENDA E. JOBE; JOSEPH L. CARPENETO as Personal Representative of the ESTATE OF JOYCE ANN CARPENETO; JOSEPH CARPENETO; NICHOLAS CHIRCHIRILLO; MICHAEL CHIRCHIRILLO; LESLIE COALE BROWN as Personal Representative of the ESTATE OF JOAN ANN COALE; LESLIE COALE BROWN DAVID D. COFFEY, M.D. as Personal Representative of the ESTATE OF JEANNETTE COFFEY; DAVID D. COFFEY, M.D. as Personal Representative of the ESTATE OF DANIEL F. COFFEY, JR.; COLLEEN MCDONALD; KEITH BRADKOWSKI; KEITH BRADKOWSKI as Personal Representative of the ESTATE OF BEVERLY SUTTON; KATHRYN E. COLLMAN; CAROLYN SUTTON; VICKI LYNN MICHEL; CHARLES GENGLER; STEVEN GENGLER; SUSAN BOHAN; TANYA DAVIS as Personal Representative of the ESTATE OF WAYNE T. DAVIS; TANYA DAVIS; GABRIELLE HUNTER DAVIS; MALACHAI ROARKE DAVIS; NOVERTA DAVIS-DEAN; JASON DIEHL; JEANNETTE DIEHL BERGQUIST; TIMOTHY REGAN as Personal Representative of the ESTATE OF EMMA FERNANDEZ REGAN; CORAZON FERNANDEZ as Personal Representative of the ESTATE OF CIRILO FERNANDEZ; RICHARD FERNANDEZ; RENEE L. GAMBOA; RENEE L. GAMBOA as Personal Representative of the

*Hoglan v. Islamic Republic of Iran*
1:03-md-01570; 1:11-cv-07550

6

ESTATE OF RANULF GAMBOA; MARIA :
JOULE; RACHEL G. MALUBAY; JAMES :
HALLER as Personal Representative of the :
ESTATE OF JAMES BOND GODSHALK; :
JANE G. HALLER; ALEESE HARTMANN :
LIVESEY; KATHRYN GRAZIOSO; KRISTEN :
GRAZIOSO; MICHAEL GRAZIOSO; CAROLEE :
AZZARELLO as Personal Representative of the :
ESTATE OF SANDRA GRAZIOSO; CAROLEE :
AZZARELLO; KAREN VENTRE; KRISTY :
GRAZIOSO; DEBORAH GRAZIOSO as :
Personal Representative of the ESTATE OF :
TIMOTHY GRAZIOSO; DEBORAH GRAZIOSO; :
LAUREN GRAZIOSO; BRIANA GRAZIOSO; :
DOUGLAS HALVORSON; KATE HALVORSON :
as Personal Representative of the ESTATE OF :
EVELYN HALVORSON; KATE HALVORSON; :
MICHAELA HAVLISH; LEA MICHAELA :
BITTERMAN; SEAN BITTERMAN; DERRICK :
HOBIN; MELODIE HOMER as Personal :
Representative of the ESTATE OF LEROY W. :
HOMER, JR.; MELODIE HOMER; LAUREL :
HOMER; JU-HSIU "CONNIE" JIAN as Personal :
Representative of the ESTATE OF HWEIDAR :
JIAN; JU-HSIU "CONNIE" JIAN; WILLIAM :
JIAN; KEVIN JIAN; AUDREY R. JONES; :
CANDY MOYER as Personal Representative of :
the ESTATE OF JOHN R. JONES; ROBERT A. :
JONES; CANDY MOYER; ANITA :
KORSONSKY; DINA LAFOND; PATRICIA :
CALOIA as Personal Representative of the :
ESTATE OF EMILY LAVELLE; PATRICIA :
CALOIA; BARBARA DZIADEK; KATHLEEN :
PALACIO; PAUL LAVELLE; BARBARA :
LURMAN as Personal Representative of the :
ESTATE OF LEON LEBOR; RINA a/k/a JOY :
KAUFMAN as Personal Representative of the :
ESTATE OF BESSIE LEBOR; BARBARA :
LURMAN; RINA a/k/a JOY KAUFMAN :
STEPHANIE GIGLIO; MICHAEL LOGUIDICE, :

7

SR.  as Personal Representative of the ESTATE OF :
CARMELLO J. LOGUIDICE; JOSEPH :
LOSTRANGIO, JR.; CATHRYN LOSTRANGIO; :
DIANE LOSTRANGIO as Personal Representative :
of the ESTATE OF JAMES LOSTRANGIO; :
KAREN LUNDER as Personal Representative of :
the ESTATE OF CHRISTOPHER E. LUNDER; :
KAREN LUNDER; ERICH MAERZ; RAMON :
MELENDEZ, JR.; RICKY MELENDEZ; :
JESSE MELENDEZ; TYLER MELENDEZ :
FLORENCE ROSARIO; MARGARET :
MONTANEZ; PETER C. MILANO; JESSICA :
MILANO STARKS; ALFRED MILANO; FRANK :
MILANO; MAUREEN RACIOPPI; THOMAS :
MILANO; PHILOMENA MISTRULLI as :
Personal Representative of the ESTATE OF :
JOSEPH D. MISTRULLI; PHILOMENA :
MISTRULLI; MARY ANN :
MISTRULLI-ROSSER; JOSEPH MISTRULLI; :
ANGELA MISTRULLI; JOHNNY S. MISTRULLI :
and MARIA LAMBERT as Personal Representative :
of the ESTATE OF ANNE MISTRULLI; MARIA :
LAMBERT; JOHNNY S. MISTRULLI; JASON :
RUBEN MORENO f/k/a ROLANDO R. :
MORENO; LEIANA MORENO; NOELIA :
MORENO; AMY MARTINEZ as Personal :
Representative of the ESTATE OF LOUIS J. :
NACKE; AMY MARTINEZ; NEAL GREEN; :
ERIC NUNEZ; THERESA PAPASSO; :
SALVATORE PAPASSO; VINCENT PAPASSO :
JOEL R. PERRY as Personal Representative of :
the ESTATE OF JAMES LESLIE PERRY; :
JOEL R. PERRY; JANICE PERRY MONTOYA; :
ANTHONY M. HOFFMAN as Personal :
Representative of the ESTATE OF CLAUDIA :
STALLWORTH; REGINALD SIMPSON; :
ROOSEVELT STALLWORTH; CARL :
STALLWORTH; CYNTHIA WATTS; ANGELA :
STALLWORTH-BLUNT; CHRISTIAN B. :
STALLWORTH f/k/a BRIAN CHRISTIAN; :

8

AMANDA ROGERS; JUDY REISS as Personal      :
Representative of the ESTATE OF GARY REISS;  :
ADAM REISS; JORDAN REISS; JONATHAN      :
REISS; JENNIFER REISS; DIANA DIAZ as      :
Personal Representative of the ESTATE OF      :
CARMEN ROMERO; DIANA DIAZ as Personal      :
Representative of the ESTATE OF ISAAC      :
ROMERO; DIANA DIAZ; LOREN ROSENTHAL :
as Personal Representative of the ESTATE OF      :
EVAN ROSENTHAL; LOREN ROSENTHAL      :
as Personal Representative of the ESTATE OF      :
SETH ROSENTHAL; AUDREY MODEL as      :
Personal Representative of the ESTATE OF      :
LEONARD ROSENTHAL; AUDREY MODEL as  :
Personal Representative of the ESTATE OF      :
FLORENCE ROSENTHAL; AUDREY MODEL      :
VICTOR SANTILLAN; RAYMOND      :
SANTILLAN; KIRSTEN SARACINI; BRIELLE      :
SARACINI; LORI BRODY; ELLEN SCHERTZER:
ROY-YETKUTIEL SHEFI; NAOMI-RUTH SHEFI:
PATRICIA SLOAN; MATT SLOAN; SARAH      :
FUNK; RAYMOND A. SMITH as Personal      :
Representative of the ESTATE OF MARION      :
THOMAS; RAYMOND SMITH, JR.; CARL      :
SMITH; KEVIN SMITH; KORRY SMITH      :
TANYA WARREN; LETRICIA SMITH; ELAINA :
SMITH-WYLIE; CHRISTINE JACKSON;      :
BARBARA HARGROVE; RAYMOND A. SMITH:
as Personal Representative of the ESTATE OF      :
MARION THOMAS; RAYMOND A. SMITH      :
as Personal Representative of the ESTATE OF      :
DEBORAH SALLAD; TIMOTHY P. SOULAS,      :
JR.; ANDREW J. SOULAS; CHRISTOPHER      :
SOULAS; MATTHEW SOULAS; NICOLE      :
SOULAS; DANIEL SOULAS; FREDERICK      :
SOULAS; STEPHEN SOULAS; FREDERICK      :
SOULAS III; DANIEL D. SOULAS; MICHELLE  :
DONLAN; DARREN STEINER; JORDAN      :
STEINER; MERIDITH REVERDITO; ROBERT      :
STEINER as Personal Representative of the      :

9

ESTATE OF WILMA STEINER; ROBERT          :
STEINER; GEORGE M. STEINER as Personal   :
Representative of the ESTATE OF GEORGE W. :
STEINER; KATHLEEN STERGIOPOULOS;         :
GEORGE STERGIOPOULOS, JR.; AARON         :
STRAUB; JONATHAN STRAUB; MICHAEL         :
STRAUB; SAMUEL STRAUB; EDWARD A.         :
STRAUB; STANLEY STRAUB; MATTHEW          :
STRAUB; SALVATORE TINO, JR.; JEFFREY     :
TINO; SALVATORE TINO, III; JOSEPH        :
NICKLO; MELLANIE CHAFE; CHRISTOPHER      :
BARTON; JOHN BARTON; MICHAEL PAIGE       :
as Personal Representative of the ESTATE OF   :
SUSANNE WARD-BAKER; PETER A.             :
MCDERMOTT as Personal Representative of the   :
ESTATE OF JEANNE MCDERMOTT; DIAN         :
DEMBINSKI as Personal Representative of the   :
ESTATE OF SANDRA WRIGHT CARTLEDGE;       :
DIAN DEMBINSKI; MELANIE BUCHMAN as       :
Personal Representative of the ESTATE OF       :
LORETTA HAINES; STEPHEN BRADISH;         :
LYNNE DUNN as Personal Representative of the   :
ESTATE OF JOHN BRADISH a/k/a JACK        :
BRADISH; GERALDINE DEBORAH SPAETER;      :
DEBRA ZEPLIN as Personal Representative of the :
ESTATE OF MARC SCOTT ZEPLIN; DEBRA       :
ZEPLIN; RYAN ZEPLIN; ETHAN ZEPLIN        :
--------------------------------------------------------------- x

HERMAN RAY as Personal Representative of the  :   *Ray v. Islamic Republic of Iran*
ESTATE OF DENEASE CONLEY; CHERRIE L.     :   1:03-md-01570; 1:19-cv-00012
ALLEN; IRMA JOYCE FLETCHER; MYRA         :
BYRD as Personal Representative of the ESTATE  :
OF EARL RAY; HERMAN RAY; HERMAN RAY:
as Personal Representative of the ESTATE OF     :
JAMES RAY; ODETTA HEYWOOD as Personal    :
Representative of the ESTATE OF STANLEY        :
RAY; BARBARA HAYNES-JENKINS; AARON       :
ADLER; ALICE DOERGE ADLER; ISABELL       :
DANSIGER ADLER; JAY ADLER;  LAUREN       :
SARAH ADLER MARTINELLI; RICHARD          :

10

DEBLASE; ANITA DEBLASE; ANTHONY            :
DEBLASE; HARLEY DINARDO as Personal        :
Representative of the ESTATE OF ESTERINA    :
DINARDO; HARLEY DINARDO; PIO               :
DINARDO; ANDREW ECONOMOS; OLGA             :
VALINOTTI; ANDREW ECONOMOS and            :
OLGA VALINOTTI as Co-Personal              :
Representatives of the ESTATE OF LEON       :
ECONOMOS; CONSTANCE FINNICUM;              :
GEORGE GABRIELLE a/k/a GABE GABRIELLE;:
VITO GARFI as Personal Representative of the :
ESTATE OF FRANCESCO GARFI; VITO            :
GARFI; VITO GARFI as Personal Representative :
of the ESTATE OF SALVATORE GARFI;          :
MARIANNA GARFI; KRISTY GRAZIOSO as        :
Personal Representative of the ESTATE OF HANK :
GRAZIOSO; THERESA COOKE; MICHELLE          :
HARGIS; CHRISTINE HOMER; CHRISTINE         :
HOMER as Personal Representative of the      :
ESTATE OF THOMAS FREIMARK; ILSE           :
HOMER; MONIQUE HOMER; MARILYN             :
JOHNSON; CHERYL HOMER WILSON;             :
GERMAINE WILSON; ANDREW BRIAN             :
JORDAN, JR.; DAVID LEBOR; RINA a/k/a Joy    :
KAUFMAN as Personal Representative of the    :
ESTATE OF PHILIP LEBOR; DANIELLE           :
MCGUIRE as Personal Representative of the     :
ESTATE OF PATRICK MCGUIRE; DANIELLE        :
MCGUIRE; MARA MCGUIRE; RYAN               :
MCGUIRE; SEAN MCGUIRE; SHEA MCGUIRE;:
ELIZABTEH MEDAGLIA-CORDES as              :
Personal Representative of the ESTATE OF      :
ROCCO MEDAGLIA; MARYELLEN                 :
MEDAGLIA as Personal Representative of the    :
ESTATE OF ANNEMARIE MEDAGLIA;             :
DIANA MEDAGLIA; KATHLEEN                  :
MEDAGLIA-DELLAPENNA; MARYELLEN            :
MEDAGLIA; MICHAEL MEDAGLIA;               :
ELIZABETH MEDAGLIA-CORDES; JOANNE         :
MISTRULLI as Personal Representative of the    :

11

ESTATE OF FRANK MISTRULLI;                          :
MARY ELLEN MURACH as Personal                       :
Representative of the ESTATE OF EDWARD              :
JOHN MURACH; MARY ELLEN MURACH;                    :
RICHARD J. MURACH; KATHERINE TYNION;               :
LOUIS PAUL NACKE II; JOSEPH NICHOLAS               :
NACKE; DALE ALLEN NACKE as Personal                :
Representative of the ESTATE OF LOUIS P.            :
NACKE; DALE ALLEN NACKE as Personal                :
Representative of the ESTATE OF PHILOMENIA          :
MILLACE NACKE; KENNETH NACKE;                       :
PAULA NACKE JACOBS; DALE ALLEN                      :
NACKE: THOMAS PAPASSO;                              :
PATRICIA MASON                                      :

---------------------------------------------------------------- x

KATHERINE MAHER as Personal Representative  :    *Maher v. Islamic Republic of Iran*
of the ESTATE OF DANIEL L. MAHER;           :    1:03-md-01570; 1:22-cv-00266
KATHERINE MAHER; DANIEL R. MAHER;           :
JOSEPH F. MAHER                             :

---------------------------------------------------------------- x

VIRGINIA BAUER as Personal Representative of  :   *Bauer v. al-Qaeda Islamic Army*
the ESTATE OF W. DAVID BAUER, II;            :    1:03-md-01570; 1:02-cv-07236
W.DAVID BAUER, III; STEPHEN BAUER;           :
JACQUELINE BAUER, HEIDI                      :
BAUER-POLLARD, as Personal Representative of :
the ESTATE OF WALTER D. BAUER;              :
HEIDI BAUER-POLLARD, as Personal            :
Representative of the ESTATE OF DOROTHY      :
BAUER; GRETCHEN ABERNATHY; HEIDI            :
BAUER-POLLARD; ROSEMARY BAUER, as           :
Personal Representative of the ESTATE OF     :
ROBERT G. BAUER; LISA BEAMER, as            :
Personal Representative of the ESTATE OF     :
TODD M. BEAMER; LISA BEAMER;                :
ANDREW T. BEAMER; MORGAN AVINGER;           :
DAVID P. BEAMER; DAVID L. BEAMER;           :
MARGARET BEAMER; MELISSA WILSON;            :
MICHELE BEAMER-SORENSEN;                    :
MARK BEATINI, as Personal Representative of  :
the ESTATE OF MICHAEL C. BEATINI;           :

12

MARK BEATINI, as  Personal Representative of        :
the ESTATE OF DORIS BEATINI; NANDA               :
BEATINI and JEFFERY PICKETT, as                  :
co-Personal Representatives of the ESTATE OF      :
MICHAEL L.  BEATINI; MARK BEATINI;               :
JEFFERY PICKETT, as Personal Representative       :
of the ESTATE OF THOMAS BEATINI; NANDA :
BEATINI; PANDORA BHARVANEY as Personal :
Representative of the ESTATE OF ANIL T.           :
BHARVANEY; PANDORA BHARVANEY;                    :
SAVITRI T. BHARVANEY; SHENAZ K.                  :
BHARVANEY DASWANI as Personal                    :
Representative of the ESTATE OF GOVIND            :
BHARVANEY; SHENAZ K. BHARVANEY                   :
DASWANI, as Personal Representative of the        :
ESTATE OF KISHORE BHARVANEY;                     :
CATHYANN BONNETT, as Personal                    :
Representative of the ESTATE OF COLIN            :
BONNETT; CATHYANN BONNETT; KODY                 :
BONNETT; JULIA V. BONNETT; MARVA                :
PARRIS as Personal Representative of the          :
ESTATE OF AUBREY A. PARRIS, HEATHER              :
BONNETT as surviving Sibling of COLIN            :
BONNETT; DEBORAH BOWDEN HART as                  :
Personal Representative of the ESTATE OF          :
THOMAS BOWDEN; DEBORAH BOWDEN                    :
HART ALISON V. BOWDEN HART, SARAH J. :
BOWDEN HART; JAMES BOWDEN;                       :
JENNIFER HENRY as Personal Representative of :
the ESTATE OF SHAWN E. BOWMAN, JR.;              :
JENNIFER HENRY; LIAM BOWMAN HENRY; :
JACK BOWMAN HENRY; CAROL A.                      :
BOWMAN, as Personal Representative of the         :
ESTATE OF SHAWN E. BOWMAN, SR;                   :
CAROL A. BOWMAN; JAMES E. BOWMAN;                :
JENNIFER BRENNAN WATERHOUSE as                  :
Personal Representative of the ESTATE OF          :
THOMAS M. BRENNAN; JENNIFER                      :
BRENNAN WATERHOUSE; THOMAS M.                    :
BRENNAN, II; CATHERINE A. BRENNAN;               :

13

JOHN O. BRENNAN and MARYBETH MAGEE :
as Co-Personal Representatives of the ESTATE OF :
JOHN V. BRENNAN; JOHN O. BRENNAN and :
MARY BETH MAGEE as Co-Personal :
Representatives of the ANITA BRENNAN; JOHN :
O. BRENNAN; PAUL BRENNAN; MARY BETH :
MAGEE; MICHAEL BRENNAN; LAURA :
BUSTILLO as Personal Representative of the :
ESTATE OF MILTON BUSTILLO; LAURA :
BUSTILLO; ALESSANDRA BUSTILLO; :
DAYNA SPORDONE; MARGARITA BETTER; :
DISSA BUSTILLO as Personal Representative of :
the ESTATE OF GILBERTO BUSTILLO, SR.; :
DISSA BUSTILLO; HENRY BUSTILLO; :
MIRNA BUSTILLO; GILBERTO BUSTILLO, JR.;:
ELIZABETH CANDELA as Personal :
Representative of the ESTATE OF JOHN :
ANTHONY CANDELA; ELIZABETH :
CANDELA; JULIETTE CANDELA; JOHN :
ARTHUR CANDELA; JOSEPH G. CANDELA as :
Personal Representative of the ESTATE OF :
JOHN C. CANDELA; JOSEPH G. CANDELA as :
Personal Representative of the ESTATE OF :
PHYLLIS CANDELA; JOSEPH G. CANDELA; :
MICHAEL SPELLER as Personal Representative :
of the ESTATE OF VALERIE SPELLER; :
THOMAS MEE as Personal Representative of the :
ESTATE OF ANN MEE; JOAN BRADY; :
HEIDI SEELBACH, as Public Administrator and :
Administratrix CTA of the ESTATE OF EDWARD :
CARLINO; HEIDI SEELBACH, as Public :
Administrator and Administratrix of the ESTATE :
OF MARIE CARLINO; LISA CARLINO; :
LEONARD DiVITTORIO as Personal :
Representative of the ESTATE OF SALVATORE :
CARLINO; LEONARD DiVITTORIO as Personal :
Representative of the ESTATE OF MARY :
CARLINO; TERESEA CUNNINGHAM as :
Personal Representative of the ESTATE OF :
MICHAEL J. CUNNINGHAM; TERESA :

14

CUNNINGHAM; WILLIAM M. CUNNINGHAM; :
PAUL CUNNINGHAM; JULIEANNE
CUNNINGHAM; BERNADETTE T. HAYES; :
SEAN CUNNINGHAM; ANDREW
CUNNINGHAM; KAREN D'AMBROSI as :
Personal Representative of the ESTATE OF :
JACK L. D'AMBROSI, JR.; KAREN :
D'AMBROSI; JACQUELINE SCALES; EMILY :
SLAVIN; TINA D'AMBROSI as Personal :
Representative of the ESTATE OF JACK L. :
D'AMBROSI, SR.; DENISE BONOLI; DEAN J. :
D'AMBROSI; MARY DANAHY as Personal :
Representative of the ESTATE OF PATRICK W. :
DANAHY; MARY DANAHY; KATHLEEN T. :
DANAHY; GRACE A. DANAHY; ALISON M. :
DANAHY; JOHN DIMEGLIO as Personal :
Representative of the ESTATE OF DAVID :
DIMEGLIO; JOHN DIMEGLIO; PATTI S. :
DIMEGLIO; DANIEL DIMEGLIO; SANDRA :
FELT as Personal Representative of the ESTATE :
OF EDWARD P. FELT; SANDRA FELT; :
KATHRYN FELT; ADRIENNE P. FELT; :
SHIRELY A. FELT; LAWRENCE FELT; :
GORDON FELT; NANCY FOSTER as Personal :
Representative of the ESTATE OF NOEL J. :
FOSTER; NANCY FOSTER; NANCY FOSTER :
as Parent and Natural Guardian of MEGAN :
FOSTER, an incapacitated adult; NICOLE :
FOSTER; BARBARA GALLUCCI, as Personal :
Representative of the ESTATE OF VINCENZO :
GALLUCCI; BARBARA GALLUCCI; ALYSSA :
GALLUCCI; JOSEPH D. GALLUCCI; :
FILOMENA GRACE SANTORELLI as :
Personal Representative of the ESTATE OF :
ANGELA GALLUCCI; FILOMENA GRACE :
SANTORELLI as Personal Representative of the :
ESTATE OF JOSEPH GALLUCCI; FILOMENA :
GRACE SANTORELLI; MICHAEL J. :
GIORDANO as Personal Representative of the :
ESTATE OF DONNA GIORDANO; MICHAEL J. :

15

GIORDANO; DOMENICK D'AMBOLA as           :
Personal Representative of the ESTATE OF  :
JESSAMINE D'AMBOLA; DOMENICK             :
D'AMBOLA; ELAINE BARRETT; LYZBETH        :
GLICK BEST as Personal Representative of the  :
ESTATE OF JEREMY GLICK; LYZBETH GLICK:
BEST; EMERSON GLICK; LLOYD GLICK;         :
JOAN GLICK; JENNIFER GLICK; JED GLICK;    :
JARED GLICK; JOANNA GLICK DANINO;         :
JONAH GLICK; JILL GOLDSTEIN as Personal   :
Representative of the ESTATE OF STEVEN     :
GOLDSTEIN; JILL GOLDSTEIN; HANNA          :
GOLDSTEIN; HARRIS GOLDSTEIN; ELSA G.      :
STRONG as Personal Representative of the   :
ESTATE OF LINDA K. GRONLUND; ELSA G.      :
STRONG as Personal Representative of the   :
ESTATE OF DORIS GRONLUND;                 :
MARGUERITE GLIDDEN, as Personal           :
Representative of the ESTATE OF ARTHUR G.  :
GRONLUND; ELSA G. STRONG; EILEEN          :
HANNAFORD as Personal Representative of the  :
ESTATE OF KEVIN J. HANNAFORD; EILEEN      :
KANNAFORD; KEVIN J. HANNAFORD, JR.;       :
PATRICK HANNAFORD; BARBARA RACHKO  :
as Personal Representative of the ESTATE OF  :
BRYAN JACK; BARBARA RACHKO;               :
JAMES T. JACK as Personal Representative of the  :
ESTATE OF JAMES H. JACK; JAMES T. JACK    :
as Personal Representative of the ESTATE OF  :
HELEN M. JACK; JAMES T. JACK;             :
THOMAS S. JOHNSON as Personal            :
Representative of the ESTATE OF SCOTT     :
JOHNSON; THOMAS S. JOHNSON;              :
MARGARET ANN JOHNSON; MARGARET           :
WAGER as Personal Representative of the    :
ESTATE OF THOMAS P. JOHNSON;             :
MARGARET WAGER; MICHELE JONES            :
FERRELL as Personal Representative of the   :
ESTATE OF DONALD T. JONES, II;           :
MICHELLE JONES FERRELL; DONALD T.        :

16

JONES, III; TAYLOR N. JONES; JUDITH                 :
JONES as Personal Representative of the ESTATE      :
OF DONALD T. JONES, SR.; JUDITH JONES;              :
WILLIAM B. JONES; LORI KANE as Personal             :
Representative of the ESTATE OF HOWARD              :
KANE; LORI KANE; JASON B. KANE;                     :
ROCHELLE KANE; ADAM KANE as Personal                :
Representative of the ESTATE OF BRUCE KANE; :
ADAM KANE; HOLLY ANN TANZ; ROSE                     :
KELLER as Personal Representative of the            :
ESTATE OF JOSEPH J. KELLER; ROSE                    :
KELLER; SYDNIE KELLER; JOSEPH D.                    :
KELLER; JUNE SASLOW; JENNIFER LUTZ;                 :
H. MICHAEL KEDEN as Personal Representative         :
of the ESTATE OF ADAM J. LEWIS;                     :
PATRICIA D. LEWIS; SOPHIA LEWIS; REILLY :
LEWIS; ARTHUR LEWIS; CAROLINE LEWIS;                :
KATHRYN HEBERT as Personal Representative           :
of the ESTATE OF GERALDINE LEWIS;                   :
PAMELA PASSERETTA; KATHRYN HEBERT;  :
CAMERON F. MACRAE, III as Personal                  :
Representative of the ESTATE OF CATHERINE F.:
MACRAE; CAMERON F. MACRAE, III; ANN B. :
MACRAE; ANN C. MACRAE; AUDREY                       :
MAGNUSON as Personal Representative of the          :
ESTATE OF RONALD E. MAGNUSON;                       :
AUDREY MAGNUSON; JEFFREY A.                         :
MAGNUSON; SHERYL A. MAGNUSON;                       :
JAMES MAHER as Personal Representative of the :
ESTATE OF JEANNE MAHER; JAMES MAHER;:
JEANNE BRANDOFINO; CHRISTINA MAHER  :
as Personal Representative of the ESTATE OF         :
RAYMOND MAHER, JR.; MARGARET MEYER :
as Personal Representative of the ESTATE OF         :
DAVID R. MEYER; MARGARET MEYER;                     :
HEIDI MENNONA; HEATHER VULPONE;                     :
DAWN MEYER-FUCHS; KRISTINE MEYER;                   :
FAITH MEYER as Personal Representative of the       :
ESTATE OF CHARLES MEYER; ELLEN ROBB :
as Personal Representative of the ESTATE OF         :

17

KRISTEN MONTANARO; ELLEN ROBB;                    :
JAMIE MONTANARO and KAREN                         :
MONTANARO, as Co-Personal Representatives         :
of the ESTATE OF FRANK MONTANARO;                 :
JAMIE MONTANARO; KAREN MONTANARO; :
BETH K. MURPHY as Personal Representative of      :
the ESTATE OF KEVIN J. MURPHY; BETH K.            :
MURPHY; CONNOR J. MURPHY; CAITLYN B.              :
MURPHY; SALLY F. RYAN as Personal                 :
Representative of the ESTATE OF TIMOTHY F.         :
MURPHY, JR.; SALLY F. RYAN; MICHAEL               :
MURPHY; TIMOTHY P. MURPHY; JOHN F.                :
MURPHY; MARY BETH DOUGHERTY;                      :
ARLENE ORSINI as Personal Representative of       :
the ESTATE OF RONALD ORSINI; ARLENE               :
ORSINI; DANIELLE ORSINI PANDOLFI;                 :
PAULINE ORSINI as Personal Representative of      :
the ESTATE OF ROBERT ORSINI; JENNIFER             :
PRICE-SALKEVER as Personal Representative of :
the ESTATE OF JEAN H. PETERSON;                   :
JENNIFER PRICE-SALKEVER;                          :
CATHERINE A. STOVER; DAVID                        :
SHERWOOD, SR. as Personal Representative of       :
the ESTATE OF GRACE P. SHERWOOD;                  :
RICHARD A. HOADLEY, ROBERT D.                     :
HOADLEY, and JENNIFER PRICE-SALKEVER :
as Co-Personal Representatives of the ESTATE OF :
WALTER E. HOADLEY; RICHARD A.                     :
HOADLEY, ROBERT D. HOADLEY, and                   :
JENNIFER PRICE-SALKEVER as Co-Personal            :
Representatives of the ESTATE OF HELEN M.          :
HOADLEY; NANCY HOADLEY as Personal                :
Representative of the ESTATE OF RICHARD           :
HOADLEY; MARGARET ECKERT, Personal                :
Representative of the ESTATE OF SEAN              :
ROONEY, Deceased; MARGARET ECKERT as             :
Personal Representative of the ESTATE OF           :
BEVERLY ECKERT; CYNTHIA BLEST as                  :
Personal Representative of the ESTATE OF           :
ROSEMARY ROONEY; CYNTHIA BLEST;                   :

18

MAURA ROONEY; SHEILA ROONEY;                              :
BRENDAN ROONEY; BRIAN ROONEY;                            :
JOHN SANDERS as Personal Representative of the :
ESTATE OF STACEY SANDERS; JOHN                           :
SANDERS; MARTHA SANDERS; LAURA                           :
SANDERS WYATT; TOMOKO T. SCHLAG                          :
as Personal Representative of the ESTATE OF              :
STEVEN F. SCHLAG; TOMOKO T. SCHLAG;                      :
DAKOTA I. SCHLAG; GARRETT M. SCHLAG;                     :
SIERRA A. SCHLAG; ELLEN HUGHES and                       :
JEAN NEBBIA as Co-Personal Representatives of :
the ESTATE OF DONALD SCHLAG; ELLEN                       :
HUGHES and JEAN NEBBIA, as Co-Personal                   :
Representatives of the ESTATE OF PATRICIA                :
SCHLAG; JEAN NEBBIA; ELLEN HUGHES;                       :
SUZANNE PENAVIC as Personal Representative :
of the ESTATE OF JOSEPH M. SISOLAK;                      :
SUZANNE PENAVIC; CHARLES MCQUADE as :
Personal Representative of the ESTATE OF PAUL :
SISOLAK; CHARLES BEN RELLER as Personal :
Representative of the ESTATE OF ANNA J.                  :
POWELL; CHARLES BEN RELLER, as Personal :
Representative of the ESTATE OF TERESA                   :
RELLER; YVONNE SISOLAK as Personal                       :
Representative of the ESTATE OF THOMAS P.                :
SISOLAK; MARY SMITH as Personal                          :
Representative of the ESTATE OF DANIEL                   :
SMITH; MARY SMITH; ELIZABETH SMITH;                     :
MICHAEL SMITH; MCCARTHY SMITH; SEAN :
PATRICK SMITH; MICHELE TANNER as                         :
Personal Representative of the ESTATE OF                 :
MICHAEL TANNER; MICHELLE TANNER;                        :
SASHA BUTLER; GIANNA TANNER; RENEE                      :
ABBATE as Personal Representative of the                 :
ESTATE OF MARY TANNER; RENEE                            :
ABBATE; KENNETH C. TANNER; MARIA                        :
MARASCIULO; NICOLE                                       :
TANNER-D'AMBROSIO; JENNIFER                              :
TARANTINO as Personal Representative of the :
ESTATE OF KENNETH JOSEPH TARANTINO; :

19

JENNIFER TARANTINO; JASON J.                    :
TARANTINO; KENNETH JAMES TARANTINO;:
AMY C. VASEL as Personal Representative of the  :
ESTATE OF SCOTT VASEL; AMY C. VASEL;            :
MATTHEW J. VASEL; RYAN A. VASEL;                :
JANYNE V. DEMBICKI as Personal                  :
Representative of the ESTATE OF CHARLES          :
VASEL; JANYNE V. DEMBICKI as Personal           :
Representative of the ESTATE OF MYNDA            :
VASEL; JANYNE V. DEMBICIKI;                      :
KATHLEEN M. WISNIEWSKI as Personal              :
Representative of the ESTATE OF ALAN L.          :
WISNIEWSKI; KATHLEEN M. WISIEWSKI;              :
JESSICA M. WISNIEWSKI; ERICA C.                 :
WISNIEWSKI; MATTHEW P. WISNIEWSKI;              :
THOMAS WARENKIEWICZ as Personal                 :
Representative of the ESTATE OF MURIEL           :
WISNIEWSKI; CHIEMI YORK as Personal             :
Representative of the ESTATE OF KEVIN P.         :
YORK; CHIEMI YORK; AIDAN YORK;                   :
CONNOR YORK; DOLORES YORK as Personal           :
Representative of the ESTATE OF JOHN YORK;       :
TIMOTHY YORK; ROSEANN ZISA as Personal          :
Representative of the ESTATE OF SALVATORE        :
ZISA; ROSEANN ZISA; CHRISTINA ZISA;             :
JOSEPH ZISA; ROSEMARIE MARTIE as               :
Personal Representative of the ESTATE OF         :
JOSEPH ZISA; ROSEMARIE MARTIE as               :
Personal Representative of the ESTATE OF         :
JOSEPHINE ZISA; ANTHONY ZISA;                    :
JANE PRESTO;                                     :
--------------------------------------------------------------x

JOAN PARKER as Personal Representative of        :    *Parker v. Islamic Republic of Iran*
the ESTATE OF PHILIP LACEY PARKER;               :    1:03-md-01570; 1:18-cv-11416
JOAN PARKER; CAROL A. SUAREZ and                 :
MANUEL T. SUAREZ as Co-Personal                  :
Representatives of the ESTATE OF DAVID S.         :
SUAREZ; CAROL A. SUAREZ; MANUEL T.               :
SUAREZ; BRYAN A. SUAREZ; KRISTEN M.             :
CARPENTER                                        :

20

```
-------------------------------------------------- x
PATRICIA D. CASAZZA as Personal              :
Representative of the ESTATE OF JOHN F.       :
CASAZZA; PATRICIA D. CASAZZA; JOHN           :
FRANCIS CASAZZA; MINDY KLEINBERG as          :
Personal Representative of the ESTATE OF ALAN :
DAVID KLEINBERG; MINDY KLEINBERG;            :
JACOB KLEINBERG; LAUREN KLEINBERG;           :
SAM KLEINBERG; LORIE JILL VAN AUKEN          :
as Personal Representative of the ESTATE OF   :
KENNETH VAN AUKEN; LORIE JILL                :
VAN AUKEN; DR. MATTHEW D. VAN                :
AUKEN; SARAH VAN AUKEN                       :
                                             :
                Plaintiffs,                  :
                                             :
            -against-                        :
                                             :
UNITED STATES OF AMERICA                     :
271 Cadman Plaza East                        :
Brooklyn, NY 11201                           :
                                             :
            Defendant/ Garnishee.            :
                                             :
-------------------------------------------------- x
```

## INTRODUCTION

Plaintiffs herein, collectively the "*Havlish* Judgment Creditors," comprise six groups of judgment creditors of the Islamic Republic of Iran. Their judgments arise out of Iran's participation in, and its provision of direct and material support for, the terrorist attacks of September 11, 2001. After an evidentiary hearing at which *Havlish* counsel presented sworn testimony from Iranian intelligence operatives, authenticated documents from Iran's intelligence services, and other pertinent evidence concerning Iran's involvement in the attacks, reports from ten experts, (including prominent staff members of the 9/11 Commission), and other proof, the United States District Court for the Southern District of New York ("SDNY") held Iran liable pursuant to 28

21

U.S.C. 1605A for causing the deaths of those killed in the attacks and for the damages caused to the 9/11 decedent estates and family members of 9/11 decedents in *Havlish, et al. v. bin Laden, et al.* See Order of Judgment at *Havlish* ECF 295 on December 22, 2011. The district court also entered extensive Findings Of Fact And Conclusions Of Law ("FOFACOL").  Similar judgments followed in, *Hoglan, et al. v. Iran, et al., Ray, et al. v. Iran, et al., Maher, et al. v. Iran, et al.*, *Bauer, et al. v. al-Qaeda Islamic Army, et al.*, and *Parker, et al. v. Islamic Republic of Iran*, citations *infra,* as well as other cases, based entirely on the *Havlish* evidence and FOFACOL.

The *Havlish* Judgment Creditors file this action under § 201(a) of the Terrorism Risk Insurance Act ("TRIA") (codified at 28 U.S.C. § 1610 note)[1] against the United States as Garnishee of approximately 127,271 Bitcoin ("Blocked Cryptocurrency" or the "Asset") that is in its possession and subject to a civil forfeiture proceeding in this Court captioned *U.S. v. Approximately 127,721 Bitcoin ("BTC") Previously Stored at the Virtual Currency Addresses Listed in Attachment A, and All Proceeds Traceable Thereto*, 1:25-cv-05745-RPK.  Some, or all, of the Blocked Cryptocurrency was mined in Iran, pursuant to a joint venture between China and Iran known as the Iran and China Investment Development Group ("Iran-China Group").  The Iran-China Group operated a large-scale Bitcoin mining operation in Rafsanjan, Kerman Province, Iran.  The Bitcoin mine, operating with both the consent and using the resources of the Iranian government, is an agency and instrumentality of Iran under controlling Second Circuit precedent and was utilized by Iran to generate cryptocurrency as part of its state policy to evade the various sanctions regimes imposed by the United States, European nations, and supranational entities. The *Havlish* Judgment Creditors seek partial satisfaction of their outstanding judgments against Iran

---

[1] The complete legal citation for TRIA is: Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337-40, as amended, Pub. L. No. 112-158, 126 Stat. 1214, 1260 (codified at 28 U.S.C. § 1610 note).

via attachment, execution, and turnover of the Blocked Cryptocurrency and in support thereof aver the following:

## THE PARTIES

1.      Plaintiffs are the *Havlish* Judgment Creditors, which comprise the following six groups who hold judgments against Iran:

      a.      In *Havlish, et. al v. bin Laden, et al.*, 1:03-cv-09848 (GBD)(SN), the SDNY entered a final and enforceable judgment on October 12, 2012, in the amount of $1,362,277,884 in compensatory damages and $4,686,235,921 in punitive damages plus pre-judgment interest. The *Havlish* Judgment, identifying each *Havlish* Judgment Creditor, and the amount of their respective judgments, along with the *Havlish* Findings of Fact and Conclusions of Law entered at *Havlish* ECF 294 on December 22, 2011, is attached as **EXHIBIT A**.

      b.      In *Hoglan, et al. v. Islamic Republic of Iran, et al.*, 1:11-cv-07550 (GBD)(SN), the SDNY entered a partial, final and enforceable judgment[2] on October 31, 2016 (restated on February 26, 2018), in the amount of $1,841,840,035 in compensatory damages plus pre-judgment interest. The *Hoglan* Judgment, identifying each *Hoglan* Judgment Creditor, and the amount of their respective judgments, is attached as **EXHIBIT B**.

---

[2] The SDNY entered a final judgment on compensatory damages in favor of the *Hoglan* Judgment Creditors. The *Hoglan* judgment is a partial final judgment.  Although the district court reserved the *Hoglan* Plaintiffs' entitlement to punitive damages for a later date, the court certified the partial judgment as a final and enforceable judgment pursuant to Fed. R. Civ. P. 54(b). An appeal was decided by the Second Circuit regarding claims of remotely related plaintiffs in *Hoglan* that were denied recovery by the trial court.  See *In Re Terrorist Attacks on September 11, 2001*, 1:03-md-01570, MDL ECF 11878 (S.D.N.Y. Mar. 18, 2026)(Daniels, J.)

c.      In *Ray, et al. v. Islamic Republic of Iran, et. al.*, 1:19-cv-00012 (GBD)(SN), the SDNY entered a partial, final and enforceable judgment[3] on February 19, 2020, in the amount of $404,750,000 in compensatory damages plus pre-judgment interest. A partial, final, enforceable judgment for economic damages for each the four 9/11 Decedent Estates in *Ray* was subsequently entered on September 20, 2024, in the amount of $54,741,860. The *Ray* Judgments, identifying each *Ray* Judgment Creditor, and the amount of their respective judgments, is attached as **EXHIBIT C**.

d.      In *Maher, et al. v. Islamic Republic of Iran, et al.*, 1:20-cv-00266 (GBD)(SN), the SDNY entered partial, final and enforceable judgments[4] totaling $222,356,450 in compensatory damages plus pre-judgment interest.[5] The *Maher* Judgments, identifying each *Maher* Judgment Creditor, and the amount of their respective judgments, are attached as **EXHIBIT D**.

---

[3] See note 2, *supra.* In the same decision, the district court found that the *Ray*, *Maher*, *Bauer*, and *Parker* judgments, *inter alia,* were final under Rule 54(b), retroactive to the dates of the judgments.

[4] See note 3, *supra.*

[5] There are two sets of plaintiffs from the Maher family in this judgment enforcement action under two different captions. The entire family received judgments on liability and damages in their favor (except the Estate's economic damages) against Iran in *Bauer v. al-Qaeda Islamic Army*. See *Bauer* ECF 20 (Judgment) and *Bauer* ECF 19-1 p. 13. At the request of the Maher family, their claims and judgments (*i.e.,* those of Katherine Maher, individually and as Personal Representative of the Estate of Daniel L. Maher, and sons Daniel Maher, and Joseph Maher) were subsequently transferred within the 9/11 MDL to a new case in order to accommodate a change to undersigned counsel and for the purposes of obtaining an economic damages award for the *Maher* 9/11 Decedent Estate and for all other purposes going forward, including judgment enforcement. This new action was first captioned *Ryan, et al. v. Islamic Republic of Iran, et al.*, but was changed to *Maher, et al. v. Islamic Republic of Iran.* The relevant transfer and captioning Orders at 9/11 MDL ECF are included in Exhibit D. Three additional 9/11 families named herein (Casazza, Kleinberg, and Van Auken), who hold liability and damages judgments against Iran obtained by other counsel, are in the process of being similarly transferred into the *Maher v. Iran* case within the 9/11 MDL. They are now represented by the undersigned counsel for all purposes going forward, including judgment enforcement.

e.  In *Bauer, et al. v. al-Qaeda Islamic Army, et al.*, 1:02-cv-07236 (GBD)(SN), the SDNY entered partial, final and enforceable judgments[6] totaling $2,605,955,741 in compensatory damages plus pre-judgment interest.[7] The *Bauer* Judgments, identifying each *Bauer* Judgment Creditor, and the amount of their respective judgments, are attached as **EXHIBIT E**.

f.  In *Parker, et al. v. Islamic Republic of Iran*, 1:18-cv-11416 (GBD)(SN), the SDNY entered partial, final and enforceable judgments[8] totaling $68,663,359 in compensatory damages plus pre-judgment interest.[9]  The *Parker* Judgments, identifying each *Parker* Judgment Creditor, and the amount of their respective judgments, are attached as **EXHIBIT F**.

2.  The Defendant/Garnishee is the United States of America. The United States is currently in possession of the Blocked Cryptocurrency that was mined, in whole or in part, by the Iran-China Group, an agency an instrumentality of the Islamic Republic of Iran. The United States concedes that 23,738.17 Bitcoin of the Blocked Cryptocurrency was mined in Iran.  See Government's Opposition to the *Fritz* Plaintiffs' *Ex-Parte* Motion for Writ of Attachment in *Fritz, et al. v. Iran and China Investment Development Group d/b/a Lubian.com*, 1:25-cv-07093-RPK, ECF 64 at p. 15.

---

[6] See note 3, *supra.*

[7] The dates of entry of judgment are various because the *Bauer* Plaintiffs received multiple judgments under the same case caption. These judgments are included in Exhibit E.

[8] See note 3, *supra..*

[9] The dates of entry of judgment are various because the *Parker* Plaintiffs received multiple judgments under the same case caption. These judgments are included in Exhibit F.

3.      The Iran-Chia Group's purpose was to mine Bitcoin which would be sold to the Central Bank of Iran for use in trade and evading the comprehensive U.S. sanctions regime imposed upon Iran, the world's foremost state sponsor of terrorism.

4.      As an agency and instrumentality of Iran, the assets of the Iran-China Group are subject to attachment and execution in partial satisfaction of the compensatory damages judgments held by the *Havlish* Judgment Creditors pursuant to TRIA.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, specifically TRIA.

6.      Jurisdiction is proper in this Court because TRIA unequivocally grants this Court subject matter jurisdiction for this post-judgment attachment and execution proceeding against a terrorist party, Iran, and any of their agencies or instrumentalities. *Havlish v. The Taliban*, 152 F.4th 339, 360 (2d Cir. 2025) citing *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) which provides that a "civil action in which a defendant is… the United States, may, except as otherwise provided by law, be brought in any judicial district in which…(B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" 28 U.S.C. § 1391(3)(1)(B).  The United States initiated an action seeking civil forfeiture of the Blocked Cryptocurrency in this District.

## FACTUAL BACKGROUND

### State Sponsorship of Terror by the Islamic Republic of Iran
### Is the Foundation of the U.S. Sanctions Regime

8. Iran has been waging virtually an undeclared war against the United States for forty-seven years. Iran wages this undeclared war through asymmetrical, or unconventional, strategies and terrorism, often through proxies such as Hezbollah, HAMAS, al-Qaeda, and others.

9. The United States Secretary of State designated Iran as a state sponsor of terrorism on January 19, 1984, and it has remained designated every year since. Countries designated as state sponsors of terrorism are those countries which have repeatedly provided support for acts of international terrorism.[10]

10. Iran has repeatedly been found liable under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1330; §§1602-1611 *et seq*., for deaths and injuries caused by its activities as a state sponsor of international terrorism, particularly in connection with acts perpetrated by terrorist organizations it sponsors, like "Hizballah" or "Hezbollah."

11. In response to Iranian and Iranian-sponsored terrorism, the Executive Branch has frequently utilized the authorities granted by the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §1701 *et seq.* Enacted in 1977, this legislation allows the President of the United States to implement various sanctions and other measures when a national emergency is declared to address threats to the United States' security and the security of its citizens.

12. Once a threat is identified and a national emergency is declared pursuant to the IEEPA, the President will issue an Executive Order outlining the actions to be taken, and sanctions

---

[10] The Secretary of State issues this determination by authority of three (3) statutes: §6(j) of the Export Administration Act of 1979, 50 U.S.C. App. §2405(j); §620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371; and §40(d) of the Arms Export Control Act, 22 U.S.C. §2780(d).

to be imposed upon, the foreign state(s) or foreign national(s) identified in the Executive Order. In turn, the Department of State, or Department of the Treasury, promulgate regulations to implement the sanctions and penalties imposed by the President's Executive Order.

13.     Sanctions are defined as "the deliberate, government inspired withdrawal, or threat of withdrawal, of customary trade or financial relations. More specifically, sanctions are punitive measures (for example, prohibiting trade, stopping financial transactions, or barring economic assistance) imposed by one country…on a target country, entity, or group of individuals that violate international norms."[11]

14.     There are two types of sanctions, primary and secondary. Primary sanctions are aimed directly at the offending nation, entity, or individual. Secondary sanctions are aimed at third parties who lie outside of U.S. jurisdiction but maintain business relationships with the sanctioned offender and also maintain business contacts in the United States, such as the use of correspondent accounts at private U.S. banks, or the use of an account at the New York Federal Reserve. Secondarily sanctioned parties are generally subject to the same financial consequences as primarily sanctioned entities.

### U.S. Sanctions and Iran's Oil Sector

17.     As fully detailed within this Complaint, the combination of primary and secondary sanctions has crippled Iran's oil industry, and thus its economy, by restricting the Iran's access to the U.S. financial system and its ability to sell its oil in the global market.

18.     This access to the U.S. financial system is critical because of the "petrodollar." Between 1973 and 1975, the United States, Saudi Arabia, and the rest of the Organization of the

---

[11] U.S. Trade Commission, Executive Briefings on Trade, *Economic Sanctions: An Overview*, March 2024 at https://www.usitc.gov/publications/332/executive_briefings/ebot_economic_sanctions_overview.pdf

Petroleum Exporting Countries ("OPEC") informally agreed to price oil in U.S. dollars and reinvest oil surpluses in U.S. Treasuries in exchange for security commitments.[12]

19.    OPEC was founded at the Baghdad Conference on September 10-14, 1960, to "co-ordinate and unify petroleum policies among Member Countries" and form a negotiating bloc for deals with investors and consuming nations.[13]  Iran is a founding member of OPEC.

20.    One way to clear oil transactions in U.S. dollars is through the Belgium-based network maintained by the Society for Worldwide Interbank Financial Telecommunication ("SWIFT").

21.    The primary role of SWIFT is as a message carrier: the SWIFT network securely transports messages containing the payment instructions between financial institutions involved in a transaction.[14] SWIFT provides the only platform allowing the secure exchange of financial information and proprietary data across financial institutions worldwide. [15]

22.     SWIFT provides two main services to the financial sector: (1) a secure network for transmitting messages between financial institutions and (2) the development and maintenance of a set of syntax standards for financial messages. SWIFT is not a bank and does not manage accounts or hold funds on behalf of its customers. Neither is it a clearing or settlement institution.

---

[12] Zaw Thiha Tun, Investopedia, *Petrodollars and Their Impact on the U.S. Dollar and Global Economy*, updated Nov. 19, 2025, at https://www.investopedia.com/articles/forex/072915/how-petrodollars-affect-us-dollar.asp *citing* D. Stokes and S. Raphael. "Global energy security and American hegemony." Johns Hopkins University Press, 2010 and F. Schmiedchen."Petrodollar Warfare, Oil, Iraq and the Future of the Dollar." New Society Publishers, 2006.

[13] Organization of the Petroleum Exporting Countries, Brief History at https://www.opec.org/brief-history.html

[14] *Federal Reserve Bank of New York Staff Reports*, no. 1047, Financial Sanctions, SWIFT, and the Architecture of the International Payments System, (Jan. 2023), p.19.

[15] *Id.*

For this reason, SWIFT does not eliminate the role of correspondent banks involved in the settlement process.[16]

23.     In 2024, SWIFT reported that 11,500 institutions located in 244 countries and territories were connected to their network, which had over 40,000 payment routes.[17] More than 13.4 billion messages were sent through the network in 2024 (an average daily volume of 53.3 million messages), 90% of which reached recipient banks within an hour.[18] This traffic is largely divided between securities trading (50.3% of volume) and payments (44.8%).[19]

24.     The Federal Reserve Bank of New York ("FRBNY") illustrates this process as follows: [20]



---

[16] *Id*.

[17] Swift CEO's annual letter to shareholders, 30 June 2025      at https://www.swift.com/news-events/news/ceos-annual-letter-shareholders

[18] *Id*.

[19] Swift Annual review 2024, p. 31 via https://www.swift.com/about-us/swift-annual-review (not a direct link).

[20] Federal Reserve Bank of New York, *Staff Reports*, no. 1047, Financial Sanctions, SWIFT, and the Architecture of the International Payments System, (Jan. 2023), p. 21.

25.     Entities that engage oil transactions typically maintain a correspondent account at a private bank in New York to clear the payments in U.S. dollars. Consider the above illustration with Country 1 as a nation in Asia that is a member of SWIFT, Country 3 as the United States, and Country 2 as Iran. Such a transaction is prohibited under the current U.S. sanctions regime.

26.     On November 5, 2008, the Department of the Treasury issued a Fact Sheet detailing strict financial measures imposed on the Iranian banking sector in compliance with the Financial Action Task Force's fourth issued statement on Iran's status of a High-Risk jurisdiction, and the March 2008 UN Security Council Resolution 1803 (which required Iran to cease and desist uranium enrichment). These new measures ended the participation of "all remaining Iranian banks, both state-owned and private, including the Central Bank of Iran" in U-turn transactions.[21] The Fact Sheet stated that:

> [T]he Treasury Department is revoking the U-turn general license today to protect U.S. financial institutions individually, and the U.S. financial system as a whole, from the significant terrorist financing and proliferation risks posed by Iran. This regulatory action will close the last general entry point for Iran to the U.S. financial system.[22]

27.     On March 15, 2012, SWIFT expelled 30 Iranian banks, including its Central Bank, to comply with sanctions imposed by the European Union.[23]  As part of the Joint Comprehension Plan of Action ("JCPOA") signed in Vienna on July 14, 2015, under President Obama, some

---

[21] A U-turn transaction is one conducted on behalf of Iranian account holders and banks, or in connection with Iran-related transactions, but the transaction only passes through the U.S. financial system on its way from one offshore non-Iranian financial institution to another.  U.S. Department of the Treasury, Fact Sheet: Treasury Strengthens Preventative Measures against Iran at https://home.treasury.gov/news/press-releases/hp1258.

[22] *Id.*

[23] Swift, *Swift instructed to disconnect sanctioned Iranian banks following EU Council decision*, on Mar. 15, 2012, at https://www.swift.com/insights/press-releases/swift-instructed-to-disconnect-sanctioned-iranian-banks-following-eu-council-decision

31

Iranian banks were permitted to participate again in SWIFT. U.S. sanctions were again fully imposed following the United States' withdrawal from the JCPOA under President Trump in 2018.

28. As sanctioned entities, the CBI, the National Iranian Oil Company, and other Iranian entities remain unable to participate in SWIFT. They are also prohibited from maintaining the necessary correspondent accounts in the U.S. to clear their oil transactions in U.S. dollars.

29. FRBNY operates currency swap lines pursuant to section 14 of the Federal Reserve Act, 12 U.S.C. § 358, which allows foreign central banks to execute currency swaps to make U.S. dollars available to them. The Board of Governors of the Federal Reserve System describes the process as follows:

> In general, these swaps involve two transactions. When a foreign central bank draws on its swap line with the Federal Reserve, the foreign central bank sells a specified amount of its currency to the Federal Reserve in exchange for dollars at the prevailing market exchange rate. The Federal Reserve holds the foreign currency in an account at the foreign central bank. The dollars that the Federal Reserve provides are deposited in an account that the foreign central bank maintains at the Federal Reserve Bank of New York. At the same time, the Federal Reserve and the foreign central bank enter into a binding agreement for a second transaction that obligates the foreign central bank to buy back its currency on a specified future date at the same exchange rate. The second transaction unwinds the first. At the conclusion of the second transaction, the foreign central bank pays interest, at a market-based rate, to the Federal Reserve. Dollar liquidity swaps have maturities ranging from overnight to three months. When the foreign central bank loans the dollars it obtains by drawing on its swap line to institutions in its jurisdiction, the dollars are transferred from the foreign central bank's account at the Federal Reserve to the account of the bank that the borrowing institution uses to clear its dollar transactions. The foreign central bank remains obligated to return the dollars to the Federal Reserve under the terms of the agreement[.]

30. The Central Bank of Iran is prohibited from maintaining an account at the FRBNY because of current sanctions and participating in currency swaps.

31. During the COVID-19 pandemic, the Federal Reserve and the Bank of Korea entered into a currency swap that provided up to $60 billion dollars, in exchange for Korean won, to ease South Korea's economy. The U.S. did the same for the Reserve Bank of Australia, the

Banco Central do Brasil, the Banco de Mexico, the Monetary Authority of Singapore, and the Sveriges Riksbank (Sweden). U.S. dollar liquidity in amounts up to $30 billion each was also made available to the Danmarks Nationalbank (Denmark), the Norges Bank (Norway), and the Reserve Bank of New Zealand.[24]

32.    More recently, the United States and Argentina finalized a $20 billion currency swap, in part, to stabilize the country's currency because "the peso [had] been weakening for months and the Central Bank and Treasury [didn't] have the dollars to defend it" in addition to political considerations due to Milei and his La Libertad Avanza party being "hit by a series of scandals that have eroded public confidence in his leadership."[25] Argentina's Central Bank "said the agreement will help to fend off market volatility and stabilize Argentina's macroeconomic situation — as well as the prices of everyday goods."[26]

33.    In April 2026, the U.S. and UAE discussed a currency swap due to the instability imposed on the UAE's economy due to the war in Iran.[27]

34.    Iran, as a designated state sponsor of terror, is unable to participate in currency swaps involving U.S. dollars and therefore cannot use that mechanism to manage their economy

.

---

[24]  Board of Governors of the Federal Reserve System, *Press Release: Federal Reserve Board announces the extensions of its temporary U.S. dollar liquidity swap lines and the temporary repurchase agreement facility for foreign and international monetary authorities (FIMA repo facility) through March 31, 2021*, issued on July 29, 2020, at https://www.federalreserve.gov/newsevents/pressreleases/monetary20200729b.htm

[25] Jaureguy, Martina, Buenos Aries Herald, *How does the US-Argentina currency swap work?* on October 21, 2025, at https://buenosairesherald.com/economics/how-does-the-us-argentina-currency-swap-work

[26] *Id*.

[27] Downs, Garrett and Cassella, Megan, CNBC, *Trump administration discussing currency swap line with United Arab Emirates* on April 21, 2026, at https://www.cnbc.com/2026/04/21/trump-iran-war-white-house-uae-currency-swap-line.html

35.     According to the Federal Reserve Economic Data compiled by St. Louis Federal Reserve, Iran's foreign currency reserves dropped from an estimated $122.5 billion in 2018 to $33.8 billion in 2024.[28] The International Monetary Fund estimates that the portion of Iran's foreign currency reserves attributable to U.S. dollars is only $7.513 billion as of 2026.[29]

36.     Thus, without access to the U.S. financial system and SWIFT, Iran turned to cryptocurrency as a means of engaging in international trade and bolstering its foreign currency reserves.

### Detailed Legal Basis for Comprehensive U.S. Sanctions on Iran, IRGC, and CBI

37.     Primary sanctions began against Iran when President Carter issued Executive Order 12170 on November 14, 1979, in response to the hostage crisis at the U.S. Embassy in Tehran. E.O. 12170 declared a national emergency on the basis that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States." Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979). Consequently, all property of Iran and the Central Bank of Iran in the United States was blocked and the Secretary of the Treasury was authorized to implement the provisions of the Executive Order. A copy of Executive Order 12170 is attached hereto as **EXHIBIT G**.

38.     Although an agreement known as the Algiers Accords was reached between the United States and Iran on January 19, 1981, to end the hostage crisis and repatriate the blocked Iranian property, Executive Order 12170 has never been terminated and provisions of the Algiers Accords regarding the repatriation of Iranian assets have yet to be fully implemented. The national

---

[28] Federal Reserve Bank of St. Louis, Federal Reserve Economic Data, Gross International Reserves Held by Central Bank for Iran, Islamic Republic of, at https://fred.stlouisfed.org/series/IRNFAFARUSD

[29] International Monetary Fund, Country Data, Current account balance U.S. Dollars (Billions of U.S. Dollars), Islamic Republic of Iran, Country Data, Select an Indicator at https://www.imf.org/en/countries/irn#countrydata

emergency declared by President Carter on November 14, 1979, with respect to Iran has been continued by every Presidential Administration since then, most recently by President Donald J. Trump via a Notice of the President of the United States issued on November 5, 2025. This Notice reads:

> On November 14, 1979, by Executive Order 12170, the President declared a national emergency with respect to Iran pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) and took related steps to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States constituted by the situation in Iran.
>
> Our relations with Iran have not yet normalized, and the process of implementing the agreements with Iran, dated January 19, 1981, is ongoing. For this reason, the national emergency declared on November 14, 1979, and the measures adopted on that date to deal with that emergency, must continue in effect beyond November 14, 2025. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency with respect to Iran declared in Executive Order 12170.
>
> The emergency declared by Executive Order 12170 is distinct from the emergency declared in Executive Order 12957 on March 15, 1995. This renewal, therefore, is distinct from the emergency renewal of March 7, 2025. [30]

A copy of this Notice is attached as **EXHIBIT H**.

39.    On March 15, 1995, President Clinton issued Executive Order 12957, Prohibiting Certain Transactions with Respect to the Development of Iranian Petroleum Resources, in which the President found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and a national emergency was declared under the authority afforded the President pursuant to the IEEPA. Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995). President Clinton prohibited American persons and corporations from engaging in various transactions involving petroleum as

---

[30] Continuation of the National Emergency with Respect to Iran, 90 Fed. Reg. 50735 (Nov. 7, 2025).

35

a result.  President Clinton ordered further sanctions via Executive Order 12959, which was issued on May 6, 1995.  This Executive Order contained broader prohibitions against transactions involving export to, financing of, and investment in Iran.  Exec. Order 12959, 60 Fed. Reg. 24757 (May 6, 1995).  A copy of Executive Orders 12957 and 12959 are attached hereto as **EXHIBIT I**.

40.    The national emergency declared by President Clinton on March 15, 1995, with respect to Iran has been continued by President Trump via a Notice of the President of the United States as recently as March 2, 2026. In this most recent Notice, the President wrote that:

> The actions and policies of the Government of Iran—including its proliferation and development of missiles and other asymmetric and conventional weapons capabilities, its network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates—continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.
>
> For these reasons, the national emergency declared on March 15, 1995, must continue in effect beyond March 15, 2026. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency with respect to Iran declared in Executive Order 12957. The emergency declared by Executive Order 12957 constitutes an emergency separate from that declared on November 14, 1979, by Executive Order 12170, in connection with the hostage crisis. This renewal, therefore, is distinct from the emergency renewal of November 5, 2025.[31]

A copy of this Notice is attached as **EXHIBIT J**.

### The Finding That Iran Is a Jurisdiction of "Primary Money Laundering Concern," the Congressional Response & E.O. 13599

41.    On October 26, 2001, President Bush signed into law the USA PATRIOT Act, Public Law 107-56.  Title III of the USA PATRIOT Act amended the anti-money laundering provisions of the Bank Secrecy Act ("BSA") to promote detection, prevention, and prosecution of international money laundering and the financing of terrorism.

---

[31] Continuation of the National Emergency with Respect to Iran, 90 Fed. Reg. 10937 (Mar. 2, 2026).

42.    One of the amendments to the BSA is contained in Section 311 of the USA Patriot Act, which grants the authority to the Secretary of the Treasury, upon a finding that reasonable grounds exist for concluding that a foreign jurisdiction is of "primary money laundering concern," to require domestic financial institutions and financial agencies to take special measures against the primary money laundering concern.  This amendment to the USA PATRIOT Act granting Treasury this authority is codified in the BSA at 31 U.S.C. §5318A.  See Department of the Treasury Finding that the Islamic Republic of Iran is a Jurisdiction of Primary Money Laundering Concern (Nov. 18, 2011), a copy of which is attached as **EXHIBIT K**.

43.    Taken as a whole, Section 311 of the USA PATRIOT Act, and its codification under the BSA at 31 U.S.C. §5318A, "provides the Secretary with a range of options that can be adapted to target specific money laundering and terrorist financing concerns most effectively." *Id*.

44.    On November 18, 2011, the Department of the Treasury, pursuant to the authority found at 31 U.S.C. §5318A, and through its delegate, the director of the Financial Crimes Enforcement Network ("FinCEN"), issued its first Notice of Finding upon determining that reasonable grounds exist for concluding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern.

45.    FinCEN is an intra-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing.  This finding was reached after the development and review of an administrative record, consultations with relevant federal agencies and departments, and after the consideration of the factors in Section 311 of the USA PATRIOT Act as codified at 31 U.S.C. §5318A.  See Exhibit L.

46.     The finding by the Department of the Treasury and FinCEN recounted the lengthy history of Iran's support for terrorism and stated:

> "The Department of State designated Iran as a state sponsor of international terrorism in 1984, and has reiterated this designation every year since 2000 in its annual Country Reports on Terrorism.  Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations.  Iran has provided extensive funding, training, and weaponry to Palestinian terrorist groups, including HAMAS and the Palestinian Islamic Jihad ("PIJ").  In fact, HAMAS, PIJ and Hezbollah have maintained offices in Tehran to help coordinate Iranian financing and training of these groups."

Exhibit L at p. 7.  (internal footnotes omitted).

47.     The finding also addressed the terrorist activity of Iran's Islamic Revolutionary Guard Corps ("IRGC"), an Iranian Judgment Debtor.  The finding states:

> "[The IRGC] was founded in the aftermath of the 1979 Islamic Revolution to defend the government against internal and external threats.  Since then, it has expanded far beyond its original mandate and evolved into a social military, political and economic force with strong influence on Iran's power structure.  In additional, elements of the IRGC have been directly involved in the planning and support of terrorist acts throughout the Middle East region.  In particular, Iran has used the IRGC –Qods Force ("Qods Force") to cultivate and support terrorist and militant groups abroad.  The Qods Force reportedly has been active in the Levant, where it has a long history of supporting Hezbollah's military, paramilitary, and terrorist activities, and provides Hezbollah with as much as $200 million in funding per year."

Exhibit L at pp. 7-8.  (internal footnotes omitted).

48.     The NDAA for Fiscal Year 2012 contained §1245 with the heading, "Imposition of Sanctions with Respect to the Financial Sector of Iran."  This section incorporated certain findings of FinCEN in 2011 as to the CBI directly into the legislation. Subsection (a) contains the following findings of the Secretary of the Treasury and of Congress:

> (1) On November 21, 2011, the Secretary of the Treasury issued a finding under section 5318A of title 31, United States Code, that identified Iran as a jurisdiction of primary money laundering concern.

38

(2) In that finding, the Financial Crimes Enforcement Network of the Department of the Treasury wrote, "The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid-2011, the CBI transferred several billion dollars to designated banks…through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks."

(3) On November 22, 2011, the Under Secretary of the Treasury for Terrorism and Financial Intelligence, David Cohen, wrote, "Treasury is calling out the Iranian banking sector, including the Central Bank of Iran, as posing terrorist financing, proliferation financing, and money laundering risks for the global financial system."

A copy of § 1245 of the National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245(a)(1)-(3), 125 STAT. 1647 is attached as **EXHIBIT L**.

49.    In addition to incorporating the findings of Treasury into the NDAA, the legislation also directed the President to exercise the powers afforded under the IEEPA to freeze the assets of Iranian financial institutions that are, or come within, the United States or control of United States persons. The relevant provisions are as follows:

(c) FREEZING OF ASSETS OF IRANIAN FINANCIAL INSTITUTIONS. –

The president shall, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of an Iranian financial institution if such property and interests in property are in the United States, come within the United States, or are or come within the possession of a United States person.

(d) IMPOSITION OF SANCTIONS WITH RESPECT TO THE CENTRAL BANK OF IRAN AND OTHER IRANIAN FINANCIAL INSTITUTIONS. -

(1) IN GENERAL – Except as specifically provided in this subsection, beginning on the date that is 60 days after the date of the enactment of this Act, the President –

(A) shall prohibit the opening, and prohibit or impose strict conditions on the maintaining, in the United States of a correspondent account or a payable-through account by a foreign financial institution that the President determines has knowingly

39

conducted or facilitated any significant financial transaction with the Central Bank of Iran or another Iranian financial institution designated by the Secretary of the Treasury for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.); and

(B)  may impose sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) with respect to the Central Bank of Iran.

National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245(c)-(d), 125 STAT. 1647-48.

50.     On February 5, 2012, President Obama issued Executive Order 13599 in order to implement §1245(c) of the NDAA to and take additional steps with respect to Iran.  Effective as of 12:01 a.m. Eastern Standard Time on February 6, 2012, E.O. 13599 explicitly blocked all property and interests in property of the Islamic Republic of Iran in the United States, including the Central Bank of Iran, all other Iranian financial institutions.  Section 1 of E.O. 13599 orders that:

(a) All property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that hereinafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

(b) All property and interests in property of any Iranian financial institution, including the Central Bank of Iran, that are in the United States, that hereinafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

(c) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State,

40

to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.[32]

A copy of Executive Order 13599 is attached hereto as **EXHIBIT M**.

51.     The issuance of E.O. 13599 by President Obama represented a shift in the way U.S. financial institutions were to approach transactions with the Central Bank of Iran and other Iranian banks. Under the prior rules, U.S. financial institutions receiving instructions to execute transactions involving sanctioned Iranian entities were not required to block, or freeze, the transactions but instead to reject them. E.O. 13599 required that all U.S. persons block the property interest held by Iran.

52.     To implement E.O. 13599, OFAC added § 560.211 and § 560.212 to Iranian Transaction and Sanctions Regulations ("ITSR") to comport with the intentions of Congress and the President.[33] Section 560.211, entitled "Prohibited transactions involving blocked property," mirrors the language of E.O. 13599 that unequivocally blocks the property and property interests of the Central Bank of Iran and other financial institutions of the Islamic Republic that are or hereafter come into the United States.

### Additional Legislation Targeting Iran and Its Financial Sector

53.     On July 1, 2010, President Obama signed into law the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010 ("CISADA"), P.L. 111-195, 22 U.S.C. §8501, *et seq.*  CISADA mandated the imposition of significant new sanctions with respect to

---

[32] Exec. Order 13599, 77 Fed. Reg. 6659 (Feb. 8, 2012).

[33] The ITSR, found at 31 C.F.R. Part 560, were originally promulgated to implement Executive Order 12613. E.O. 12613 was issued by President Ronald Reagan on October 29, 1987, based upon, *inter alia*, the President's finding "that the Government of Iran is actively supporting terrorism as an instrument of state policy."

41

foreign financial institutions, and was built upon, and designed to give effect to, U.N. Security Council Resolution 1929.

54.     Section 104(c) of CISADA, codified at 22 U.S.C. §8513(c), authorized new regulations to be promulgated by the Secretary of the Treasury pursuant to the President's powers afforded him under the IEEPA.  This section directs that, "[n]ot later than 90 days after July 1, 2010, the Secretary of the Treasury shall prescribe regulations to prohibit, or impose strict conditions on, the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that the Secretary finds knowingly engages in an activity described in paragraph (2)."  22 U.S.C. §8513(c)(1).

55.     The activities described in paragraph (2) include, *inter alia*, money laundering and "efforts by the Central Bank of Iran or any other Iranian financial institution" to facilitate the efforts of the Government of Iran, including the efforts of the Islamic Revolutionary Guard Corps, to "acquire or develop weapons of mass destruction or delivery systems of weapons of mass destruction" or "to provide support for organizations designated as foreign terrorist organizations…or support for acts of international terrorism." 22 U.S.C. §8123(c)(2)(A)-(E).

56.     The Secretary of the Treasury may waive the application of a prohibition or condition imposed with respect to a foreign financial institution pursuant to subsection (c) only if the Secretary "determines that such a waiver is necessary to the national interest of the United States [] and submits to the appropriate congressional committees a report describing the reasons for the determination."  22 U.S.C. §8513(f)(1)-(2).

57.     The provisions of CISADA do not terminate until 30 days after the date that the President certifies to Congress that "the Government of Iran has ceased providing support for acts of international terrorism and no longer satisfies the requirements for designation as a state sponsor

42

of terrorism," and that "Iran has ceased the pursuit, acquisition, and development of, and verifiably dismantled its, nuclear, biological, and chemical weapons and ballistic missiles and ballistic missile launch technology." 22 U.S.C. §8551(a)(1)-(2).

58.    The President has provided no such certification to Congress at the time of the filing of this Complaint, and Iran continues to be designated as a state sponsor of terror as it has every year since 1984.

59.    On August 10, 2012, President Obama signed into law the Iran Threat Reduction and Syria Human Rights Act of 2012 (ITRSHRA), P.L. 112-158, 22 U.S.C. § 8701 *et seq*. The Iran-related provisions in the law provide for sanctions on activities related to Iran's energy and financial sectors, proliferation of weapons of mass destruction, support for terrorism, and human rights abuses. Section 217 of ITRSHRA, codified at 22 U.S.C. § 8724, provides that "Executive Order No. 13599 (77 Fed. Reg. 6659), as in effect on the day before August 10, 2012, shall remain in effect until the date that is 90 days after the date on which the President submits to the appropriate congressional committees the certification described in subsection (d)." 22 U.S.C. § 8724(a).

60.    The certification described in subsection (d) that is required for termination of E.O. 13599 is as follows:

(d) CERTIFICATION DESCRIBED

(1) IN GENERAL
The certification described in this subsection is the certification of the President to Congress that the Central Bank of Iran is not—

(A) providing financial services in support of, or otherwise facilitating, the ability of Iran to—
(i) acquire or develop chemical, biological, or nuclear weapons, or related technologies;
(ii) construct, equip, operate, or maintain nuclear facilities that could aid Iran's effort to acquire a nuclear capability; or

43

(iii) acquire or develop ballistic missiles, cruise missiles, or destabilizing types and amounts of conventional weapons; or

(B) facilitating transactions or providing financial services for—
(i) Iran's Revolutionary Guard Corps; or
(ii) financial institutions the property or interests in property of which are blocked pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) in connection with—
(I) Iran's proliferation of weapons of mass destruction or delivery systems for weapons of mass destruction; or
(II) Iran's support for international terrorism.

22 U.S.C. § 8724(d)(1)(A)-(B).

61.     No such certification to Congress, as described in 22 U.S.C. § 8724(d) to terminate or modify E.O. 13599 with respect to CBI, has been submitted to date.  Nor could the President issue such a certification, as Iran's state sponsorship of terrorism remains unabated.  See 22 U.S.C. § 8724(d)(1)(B)(ii)(II).[34]

62.     On May 8, 2018, President Trump announced the withdraw of the United States from the JCPOA. Sanctions against Iran that had been terminated by the JCPOA snapped back into place.

63.     On February 4, 2025, the White House issued a National Security Presidential Memorandum ("NSPM-2") as part of President Trump's "maximum pressure" policy with respect to Iran's nuclear program, the development of intercontinental ballistic missiles, and Iran's malign regional and international activities. The NSPM-2 reads, in part, that:

> Section 1.  Policy.  It is the policy of the United States that Iran be denied a nuclear weapon and intercontinental ballistic missiles; that Iran's network and campaign of regional aggression be neutralized; that the IRGC and its surrogates be disrupted, degraded, or denied access to the resources that sustain their

---

[34] *See also* United States Department of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2023* at https://www.state.gov/reports/country-reports-on-terrorism-2023/

destabilizing activities; and to counter Iran's aggressive development of missiles and other asymmetric and conventional weapons capabilities.[35]

64.    The NSPM-2 directed a number of agencies in the Executive Branch, including the Department of the Treasury and Department of State, to carry out specific tasks, including the following:

Sec. 2.  Enacting Maximum Pressure on the Islamic Republic of Iran.

(a)  The Secretary of the Treasury shall:

(i)    immediately impose sanctions or appropriate enforcement remedies on all persons for which the Department has evidence of activity in violation of one or more Iran-related sanctions;

(ii)    implement a robust and continual sanctions enforcement campaign with respect to Iran that denies the regime and its terror proxies access to  revenue;

(iii)  review for modification or rescission any general license, frequently asked question, or other guidance that provides Iran or any of its terror proxies any degree of economic or financial relief;

(iv)    issue updated guidance to all relevant business sectors including shipping, insurance, and port operators, about the risks to any person that knowingly violates United States sanctions with respect to Iran or an Iranian terror proxy;

and

(v)    maintain countermeasures against Iran at the Financial Action Task Force, evaluate beneficial ownership thresholds to ensure sanctions deny Iran all possible illicit revenue, and evaluate whether financial institutions should adopt a "Know Your Customer's Customer" standard for Iran-related transactions to further prevent sanctions evasion.

(b)  The Secretary of State shall:

(i)    modify or rescind sanctions waivers, particularly those that provide Iran any degree of economic or financial relief, including those related to Iran's Chabahar port project;

---

[35] The White House, National Security Presidential Memorandum/NSPM-2 February 4, 2025, at https://www.whitehouse.gov/presidential-actions/2025/02/national-security-presidential-memorandum-nspm-2/

45

> (ii)  implement a robust and continual campaign, in coordination with the Secretary of the Treasury and other relevant executive departments or agencies (agencies), to drive Iran's export of oil to zero, including exports of Iranian crude to the People's Republic of China;

> (iii)  lead a diplomatic campaign to isolate Iran throughout the world, including within international organizations, including the denial of freedom of movement or safe haven to the IRGC or any terror proxy of Iran wherever such may operate outside Iran's borders; and

> (iv)  take immediate steps, in coordination with the Secretary of the Treasury and other relevant agencies, to ensure that the Iraqi financial system is not utilized by Iran for sanctions evasion or circumvention, and that Gulf countries are not used as sanctions evasion transshipment points.

### The Scheme by the Iranian Judgment
### Debtors to Evade U.S. Sanctions by Mining Cryptocurrency

65.    Iran, a nation rich in a valuable commodity traded in U.S. dollars but cut off from SWIFT and the entire U.S. financial system, turned toward cryptocurrency after President Trump's withdrawal from the JCPOA.

66.     Cryptocurrency was not only used as a tool to bypass banking restrictions in international trade, but also as a strategic vehicle to fund proxy groups across the Middle East. [36]

67.    The Islamic Republic has been open about its use of Bitcoin and other cryptocurrencies as a means of evading sanctions and stimulating its economy. On August 29, 2022, *Iran International* reported that:

> Iran has officially approved the use of cryptocurrency for imports as a measure to circumvent US sanctions imposed on its finance and banking sector.

> Industry, Mines and Trade Minister Reza Fatemi Amin said on Monday that the regulations for using cryptocurrencies instead of dollar and euro was finalized by the administration on Sunday.

---

[36] Khatinoglu, Dalga, Middle East Forum Observer, *How Iran's Cryptocurrency Gamble Empowers the Revolutionary Guard and Drains the State*, Middle East Forum Observer on May 14, 2025, at https://www.meforum.org/mef-observer/how-irans-cryptocurrency-gamble-empowers-the-revolutionary-guards-and-drains-the-state

"All the issues related to crypto-assets, including how to provide fuel and energy, and how to assign and grant licenses were devised," he added.

The use of cryptocurrencies in imports is one of the ways to circumvent sanctions because cryptocurrencies are not traded through normal channels such as banks and it is very difficult to track them.

Earlier in the month, Iran made its first official import cryptocurrency order, worth $10 million, as a test run for allowing the country to trade through digital assets that bypass the dollar-dominated global financial system and to trade with other countries similarly embargoed by US sanctions, such as Russia.

"By the end of September, the use of cryptocurrencies and smart contracts will be widely used in foreign trade with target countries," said Alireza Peymanpak, a deputy Iranian trade minister who leads Iran's Trade Promotion Organization (TPO).[37]

69.    During November 2022, *Reuters* reported that blockchain data showed crypto giant Binance had processed Iranian transactions with a value of $8 billion since 2018 despite U.S. sanctions intended to cut Iran off from the global financial system.[38]

70.    Binance agreed to pay almost $1 billion to settle over 1.6 million apparent violations of multiple sanctions programs. On November 21, 2023, the Department of the Treasury announced that:

Binance Holdings, Ltd. ("Binance"), a Cayman Islands virtual currency exchange with affiliates around the world, has agreed to pay $968,618,825 to settle its potential civil liability for 1,667,153 apparent violations of multiple sanctions programs administered by the Office of Foreign Assets Control (OFAC). For over five years, between August 2017 and October 2022, Binance matched and executed virtual currency trades on its online exchange platform between U.S. person users and users in sanctioned jurisdictions or blocked persons.[39]

---

[37] Iran International, *Iran Approves Use Of Cryptocurrency For Imports To Bust Sanctions* (Aug. 29, 2022) at https://www.iranintl.com/en/202208293261

[38] Berwick, Angus and Wilson, Tom, Reuters, *Crypto exchange Binance helped Iranian firms trade $8 billion despite sanctions* on Nov. 7, 2022, at https://www.reuters.com/business/finance/exclusive-crypto-exchange-binance-helped-iranian-firms-trade-8-billion-despite-2022-11-04/

[39] Department of the Treasury, Enforcement Release, OFAC Settles with Binance Holdings, Ltd. for $968,618,825 Related to Apparent Violations of Multiple Sanctions Programs Nov. 21, 2023, at https://ofac.treasury.gov/system/files/2023-11/20231121_binance.pdf

71.     Almost all the funds, some $7.8 billion, flowed between Binance and Iran's largest crypto exchange, Nobitex, according to a review of data from leading U.S. blockchain researcher Chainalysis.[40] A subsequent investigation by *Reuters* into Nobitex published May 1, 2026, determined:

> The sons of a powerful family with close ties to Iran's new supreme leader control the country's largest cryptocurrency exchange, transforming it from a startup into a conduit to the global economy used by both blacklisted state institutions and ordinary citizens.
>
> Since Nobitex was founded by the two brothers under an alternative family name, it has processed between tens and hundreds of millions of dollars in transactions linked to sanctioned groups including Iran's central bank and the powerful Islamic Revolutionary Guard Corps, a Reuters investigation has found.
>
> The two are members of the Kharrazi family, one of the most influential dynasties in the Islamic Republic. Corporate records show that when the exchange started, the brothers were listed under a surname rarely used by members of the family.
>
> The brothers are the third Kharrazi generation at the heart of Iran's ruling establishment. Kharrazis have advised supreme leaders and occupied key political, diplomatic and religious posts. The clan is related by marriage to all three supreme leaders of the Islamic Republic: the revolutionary founder Ayatollah Ruhollah Khomeini, the late Khamenei, and Khamenei's son, Mojtaba.
>
> Brothers Ali and Mohammad Kharrazi – using the family surname Aghamir – built Nobitex into the country's dominant cryptocurrency provider. It handles an estimated 70% of Iran's crypto transactions. It's not unheard of for some Iranians to have and use alternative family names. But the brothers appear to be the only ones in their immediate family to routinely distance themselves from their famous bloodline.[41]

**Iran's State Investment in Cryptocurrency and Its Link to the Central Bank of Iran**

---

[40] *Id*.

[41] Finch, Gavin, et al., Reuters, *One of Iran's most powerful families founded its largest crypto exchange. It's used by the IRGC to move millions* on May 1, 2026, at https://www.reuters.com/investigations/one-irans-most-powerful-families-founded-its-largest-crypto-exchange-its-used-by-2026-05-01/

72.     By January 2019, the Central Bank of Iran ("CBI") published a draft cryptocurrency regulatory framework that proposed legalizing limited use of cryptocurrencies within the confines of the country's foreign currency laws. By August, Iran officially announced that mining cryptocurrencies was legal both inside and outside its major cities, in addition to free and special trade zones, provided applicants obtain a permit from the Ministry of Industry, Mine and Trade. However, the cryptocurrency could not be used locally.[42]

73.     The National Council of Resistance of Iran summarized these developments as follows:

> By 2019, the clerical regime officially recognized crypto mining as an industry and introduced a licensing regime for miners, offering cheap electricity to attract investment *on the condition that all mined Bitcoin be sold to Iran's central bank*. The prospect of subsidized power drew interest from domestic players and foreign partners – notably Chinese investors who set up large Bitcoin farms in Iran's free trade zones and remote warehouses.[43] (emphasis added).

A copy of this article is attached as **Exhibit N**.

74.     On April 11, 2019, Bitcoin.com published a news article entitled *Chinese Bitcoin Miners Develop Strong Relationships and Crypto Mining Facilities in Iran*. The theme was that Chinese miners were establishing operations in Cambodia, Thailand, Vietnam, and Iran due to low electricity costs.[44]

---

[42] Motamedi, Maziar, *Iran's government recognises cryptocurrency mining with caveat*, Al Jazeera on August 5, 2019 at https://www.aljazeera.com/economy/2019/8/5/irans-government-recognises-cryptocurrency-mining-with-caveat (emphasis added).

[43] Kia, Shahariar, National Council of Resistance of Iran, *Bitcoin Mining in Iran, IRGC Operations and the Power Grid Crisis* on May 26, 2025, at https://www.ncr-iran.org/en/publications/special-reports/bitcoin-mining-in-iran-irgc-operations-and-the-power-grid-crisis/

[44] Bitcon.com, *Bitcoin Miner Recounts Struggle to Obtain Cheap Iranian Power,* April 11, 2019, at https://news.bitcoin.com/bitcoin-miner-recounts-struggle-to-obtain-cheap-iranian-power/

75.     There was a problem, however. Miners had difficulty getting the necessary technology into Iran. Speculation was that Iranian customs authorities had confiscated 40,000 mining rigs at the border. Chinese miner Liu Feng planned to run a cryptocurrency operation with 20,000 Antminer T9 units, which cost $350 to $350 at the time, and weighed about nine pounds. He had planned to deliver the entire lot to Iran, but the Iranian authorities blacklisted the import of miners because the power grid in Iran became subject to blackouts due to the increased drain on its power grid by mining operators.  Feng eventually transported 3,000 miners into Iran through friendly customs officials who declared the equipment as something other than a cryptocurrency miner. Some were confiscated during negotiations over rates with a local electricity supplier.[45]

76.     Iranian authorities eventually cracked down on unlicensed, illegal mining operations because of the effect on the county's power grid. Tavanir, the state-owned electricity company, announced in March 2025 that 240,000 cryptocurrency mining rigs had been seized from unlicensed miners, and an estimated 700,000 unlicensed rigs remained.[46] By June 2025, Tavanir stated that cryptocurrency accounted for 5% of all power consumption in Iran and represented 20% of the grid's power deficit. Mining operations were consuming electricity at "roughly the output of two Bushehr nuclear reactors."[47]

77.     The enforcement by the Iranian authorities, however, was selective. In reality, Iran's cryptocurrency industry was taken over by the Islamic Revolutionary Guard Corps "IRGC").

---

[45] *Id.*

[46] Iran International, *Iran says 240,000 cryptocurrency mining rigs seized in crackdown*, Mar. 9, 2025, at https://www.iranintl.com/en/202503093831

[47] Iran International, *Crypto mining accounts for up to 20% of Iran's power shortage*, July 29, 2025, at https://www.iranintl.com/en/202507292053

78.     The IRGC is a military force parallel to the regular Iranian military and to the formal governmental structure, although it is not subject to supervision by the Iranian parliament. Instead, it operates as an agent and instrumentality of the Supreme Leader himself. The IRGC's responsibilities and powers are described in the Iranian Constitution, and the IRGC reports directly to Iran's Supreme Leader. The IRGC, also known as the *Sepah Pasdaran*, is both the guardian and the striking arm of the Islamic Revolution and strongly asserts its constitutional role as defender of the Islamic Revolution.  The IRGC is a major factor in the Iranian economy: it owns and controls hundreds of companies and commercial interests, particularly in the oil and gas sector, engineering, telecommunications and infrastructure, and it holds billions of dollars in military, business, and other assets and government contracts.[48]

79.     By 2019–2020, reports indicated that Tehran's most influential power brokers – the IRGC and entities under Supreme Leader Ali Khamenei – had moved aggressively into crypto mining.[49]

80.     IRGC-linked organizations – including large religious foundations like Astan Quds Razavi ("AQR") – formed a veritable "crypto cartel" that plunders national electricity for profit, according to investigative reports. These state-affiliated miners enjoy effectively free energy (or ignore bills entirely), operating with impunity thanks to political connections and armed protection.[50]

81.     The IRCG's grip on the industry is so strong that Iran's own enforcement agencies, concerned about the electric grid, have found it nearly impossible to rein in these operations. In

---

[48] Findings of Fact and Conclusions and Law, *Havlish v. bin Laden*, Conclusions of Law ¶¶ 21-30.

[49] Kia, Shahariar.

[50] *Id.*

one 2021 incident, the Ministry of Energy attempted to shut down an illegal mining center, only for armed IRGC units to physically block the raid and prevent any interruption.[51]

82.     The Ministry of Intelligence and Security (the Iranian governmental equivalent to the FBI and CIA) declined to intervene against the IRGC, illustrating the impunity of the Guards' mining ventures. While authorities publicly crack down on small-scale "illegal" miners, the largest mining centers – run by or for regime insiders – often remain untouched.[52]

83.     As recently as January 9, 2026, TRM Labs, which delivers blockchain intelligence to detect crypto-facilitated crime, found two UK-based front companies that have facilitated operational financing for the IRGC. Together, the exchanges - identified as Zedcex and Zedxion - have processed approximately $1 billion in funds linked to the IRGC, accounting for roughly 56% of their total transaction volume, with that share peaking at 87% in 2024.[53]

84.     A key figure in this network is Babak Zanjani, a longtime Iranian sanctions-evasion financier previously sanctioned for laundering billions in oil revenue on behalf of regime entities, including the IRGC. His direct connection to the corporate trail behind Zedcex underscores that this activity is not opportunistic crypto abuse, but the continuation of a well-established state-aligned financial network adapting to new rails.[54]

85.     Six days later, Chainalysis reported that Iran's "crypto ecosystem reached over $7.78 billion in 2025" and stated that:

---

[51] *Id.*

[52] *Id.*

[53] TRM Labs, *How Two UK-registered Companies Moved Over a Billion in Stablecoins for the IRGC*, Jan. 9, 2026, at https://www.trmlabs.com/resources/blog/how-two-uk-registered-companies-moved-over-a-billion-in-stablecoins-for-the-irgc

[54] *Id.*

Particularly noteworthy is the IRGC's growing dominance within Iran's cryptocurrency landscape. Addresses associated with the IRGC's sprawling transnational facilitation networks have fluctuated over recent years, but as seen below, have risen steadily over time as a share of the overall Iranian crypto economy and accounted for over 50% of total values received in Q4 of 2025. This trend has not occurred in a vacuum, mirroring the IRGC's expanding control over Iran's broader economy and political institutions. In 2024, the volume of funds received by IRGC-associated addresses on-chain reached over $2 billion, spiking to more than $3 billion in 2025.[55]

86.     AQR is part of the IRGC crypto cartel through a 550-year-old charity that maintains the shrine to Imam Reza in Mashad, Iran that was founded in 1510. Its maintenance endowment has accrued over centuries.

87.     Since the 1979 Islamic Revolution, AQR has grown to employ 19,000 people and its assets include 50 large companies and 43 percent of Mashhad real estate, the second-most populous city in Iran. These land holdings are worth an estimated $20 billion. AQR has reportedly invested in the production of materials for use in ballistic missile propellant.

88.     AQR operates as a "bonyad," which the U.S. Treasury explains as follows:

Bonyads are opaque, quasi-official organizations generally controlled by current and former government officials and clerics that report directly to the Supreme Leader. Bonyads receive benefits from the Iranian government, including tax exemptions, but are not required to have their budgets publicly approved. This lack of accountability has enabled the bonyads to expand their economic activities far beyond their original remit and has led to the accumulation of vast amounts of wealth without delivering the promised benefit to the people of Iran. Further, the lack of accountability has allowed systemic corruption and mismanagement to grow unchecked, with only low level or isolated actors being held to account by the regime. [56]

---

[55] Chainalysis Team, *Inside Iran's Growing $7.8 Billion Crypto Ecosystem: IRGC Dominance and a Flight to Bitcoin Reflect Geopolitical Tensions and Domestic Unrest* on Jan. 16, 2026, at https://www.chainalysis.com/blog/iranian-crypto-activity-geopolitical-tensions-2026/

[56] U.S. Department of the Treasury, Press Release: *Treasury Targets Billion Dollar Foundations Controlled by Iran's Supreme Leader* on Jan. 13, 2021, at https://home.treasury.gov/news/press-releases/sm1234

89.    Behzad Nabavi, a government minister in several administrations, said in an interview with the state-run Alef news agency on September 21, 2019, "In our country, there are four institutions which control 60 percent of the national wealth…none of these institutions are in connection with the government and parliament."[57]

90.     One of these four institutions is AQR.

91.    AQR has played an active role in providing financial, material and logistical support to fundamentalist and terrorist groups within the last few years.  Particularly, the heads of AQR have vast relations with Hezbollah's top officials.[58] A copy of an article from the National Counsel of Resistance of Iran entitled *The Role of Astan-e Quds Razavi, a Key "Religious Foundation", in Iranian Regime's Terrorism, Extremist Policies, And Recruitment of Western Spies* is attached as **Exhibit O**.

92.    Ebrahim Raisi was the custodian of AQR in the years before he took office as Iran's eighth president in August 2021. Known as the "Butcher of Tehran," Raisi was part of the death committee that ordered the executions of thousands of political opponents across the country in 1988. The U.S. Department of Treasury placed Raisi on its sanctions list on November 5, 2019.

93.    Following his death in a helicopter crash in 2024 during his presidential term, Raisi was interred at the Shrine over which AQR watches.

---

[57] Saadati, Shamsi, National Council of Resistance of Iran, *Iran's Raisi Wants to Combat Corruption With a Controversial Cabinet*, September 19, 2021, at https://www.ncr-iran.org/en/news/economy/irans-raisi-wants-to-combat-corruption-with-a-controversial-cabinet/

[58] National Council of Resistance of Iran, *The Role of Astan-e Quds Razavi, a Key "Religious Foundation", in Iranian Regime's Terrorism, Extremist Policies, And Recruitment of Western Spies* on Nov. 8, 2019, at https://www.ncr-iran.org/en/publications/special-reports/the-role-of-astan-e-quds-razavi-a-key-religious-foundation-in-iranian-regime-s-terrorism-extremist-policies-and-recruitment-of-western-spies/

94.     While the custodian of AQR, Raisi personally visited Lebanon at the end of January 2018 and met Hezbollah leaders, including Secretary-General Hassan Nasrallah. He also visited Hezbollah's military positions in southern Lebanon. Raisi met with the family members of the highest-ranking deceased commanders of Hezbollah involved in the regime's terrorist operations and expressed his support of them.



Ebrahim Raisi, then custodian of Astan-e Quds (now the regime's judiciary chief), personally visited Lebanon at the end of January 2018 and met Hezbollah leaders, including Secretary General Hassan Nasrallah

[59]

95.     Raisi met with the family of the deceased Imad Mughniyeh, the former second-in-command of Hezbollah and its military commander who was known as and the world's premier terrorist.[60]

96.     The first high-profile terror act linked to Mughniyeh was the 1983 attack on the U.S. Embassy in Beirut that killed sixty-three people. In the fall of the same year, he masterminded the twin truck bombings in Beirut that hit a building housing French paratroopers, killing 58, and

---

[59] *Id.*

[60] *Id.* See also *Havlish* FOFACOL, ¶¶ 62-65.

a U.S. army barracks, killing 241 marines. Mughniyeh also engineered a series of high-profile kidnappings, including the CIA's Beirut station chief William Buckley (who was later killed), and AP correspondent Terry Anderson, who was held for six years prior to his release. Mughniyeh was also implicated in -- and subsequently indicted for -- the 1985 hijacking of TWA flight 847, which resulted in the execution of U.S. navy diver Robert Stetham.[61]

97.     Mughniyeh was part of the 9/11 operation. Mughniyah and other Hezbollah officials in Lebanon and in Iran had actual foreknowledge of, and participated in planning, the 9/11 conspiracy under the supervision of Iran.[62]

98.     The 9/11 Commission determined that, in November 2000, "muscle" hijacker Ahmed al Ghamdi "flew to Beirut – perhaps by coincidence – on the same flight as a senior Hezbollah operative."  9/11 REPORT at p. 240.

99.     This was no coincidence, and the U.S. District Court for the Southern District of New York found so.[63]

100.     As found by the 9/11 Commission, in mid-November 2000, three muscle hijackers, having obtained U.S. visas, "traveled in a group from Saudi Arabia to Beirut and then onward to Iran.  An associate of a senior Hezbollah operative was on the same flight that took the future hijackers to Iran." 9/11 REPORT at p. 240.

101.     As found by the 9/11 Commission, "Hezbollah officials in Beirut and Iran were expecting the arrival of a group during the same time period.  The travel of this group was important enough to merit the attention of senior figures of Hezbollah."  9/11 REPORT at p. 240.

---

[61] Levitt, Matthew and Schenker, David, The Washington Institute of Near East Studies, *Who Was Imad Mughniyeh?* at https://www.washingtoninstitute.org/policy-analysis/who-was-imad-mughniyeh

[62] *Havlish* FOFACOL at ¶ 143.

[63] *Havlish* FOFACOL at ¶¶ 141-42.

102.     The "senior operative of Hezbollah" (or "senior Hezbollah operative") referenced in the 9/11 REPORT was Imad Mughniyah.[64]

103.     The "activities" that Mughniyah went to Saudi Arabia to "coordinate" revolved around the hijackers' travel, their obtaining new Saudi passports and/or U.S. visas for the 9/11 operation, the hijackers' security, and the operation's security.[65]

104.     The ties between AQR, the IRGC, and Iran's international terrorism apparatus cannot be disputed.

**The Iran-China Group**

105.     Iran's subsidized electricity remains among the cheapest in the world.

106.     Large amounts of electricity are required to power the equipment necessary to mine Bitcoin and other cryptocurrencies, and each mining device runs 24/7. In 2019, Al Jazzera reported that "[a] study published last year by two Iranian energy experts found that mining one bitcoin in Iran is equal to producing 107 barrels of oil or 15,000 cubic meters of natural gas."[66] In 2025, Iran International spoke to Hadi Sefidmou, the head of Iran's Crypto Mining Oversight and Regulation Initiative, and reported that "producing a single Bitcoin with older mining devices can consume up to 1 million kilowatt-hours (kWh) — equivalent to the annual power use of 440 Iranian households."[67]

---

[64] *Havlish* FOFACOL at ¶ 139.

[65] *Havlish* FOFACOL at ¶ 140.

[66] Motamedi, Maziar, Al Jazzera, *Iran's cryptocurrency miners are feeling the heat this summer*, on June 28, 2019, at https://www.aljazeera.com/economy/2019/6/28/irans-cryptocurrency-miners-are-feeling-the-heat-this-summer

[67] Iran International, *Crypto mining accounts for up to 20% of Iran's power shortage*, July 29, 2025 at https://www.iranintl.com/en/202507292053

107.    Under Khamenei's directive, the IRGC partnered with Chinese companies to establish massive mining farms to earn Bitcoin to compensate for Iran's loss of access to U.S. dollars.[68]

108.    One high-profile example was a 175-megawatt Bitcoin farm in Rafsanjan in Kerman province, ostensibly a joint venture between an IRGC-linked enterprise and Chinese investors, attracted by Iran's rock-bottom subsidized electricity pricing regime.[69]

109.    The massive facility utilized 54,000 miners and was the largest authorized mining operation in Iran, causing such a drain on the electricity grid that by January 2021 it was causing blackouts in Tehran. Middle East Eye reported that "[t]he farm, which operates under the name of the company Iran-China Investment Development Group, has rejected the allegations, blaming inefficiency in the Iranian electricity industry for the blackouts. However, following a public outcry, Fassihi Harandi, the governor of Rafsanjan, announced that the farm had voluntarily stopped its activities."[70]

110.    The halt in mining production did not last long. In April 2021, Iranwire reported that:

> State-approved Bitcoin mining is set to resume in a city in Kerman after receiving heavy Chinese investment, its MP confirmed in parliament yesterday.
>
> Hossein Jalali, the representative for the city of Rafsanjan, told the chamber on Wednesday, April 14 that billions of tomans' worth of Chinese money had been poured into a Bitcoin mining farm in the city and "should not be lost".
>
> The site and others made headlines in January this year after being blamed for widespread power outages across several Iranian cities. Iranian media

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

and the Iranian Electricity Company said the Rafsanjan facility alone had been using 175 megawatt-hour (MWh) of electricity from the total 600 MWh allotted to all cryptocurrency factories in the country. It was temporarily closed on the orders of the governor of Kerman after local demonstrations broke out, prompted by the blackouts. Residents have now expressed concerns about the prospect of the site reopening – especially since, according to ILNA News Agency, no action has been taken to enhance electricity provision in the province since January.

The Islamic Republic sees cryptocurrencies such as bitcoin as a means to circumvent sanctions and increase its revenues. Bitcoin and other cryptocurrency mining farms need a permit from the state to operate, though in practice "illegal" mining is thought to account for around half of all cryptocurrency mining in Iran.[71]

111.   Iran's heavily subsidized electricity (with rates as low as $0.01–0.05 per kilowatt-hour for some users) makes crypto mining exceptionally profitable – and thus tempting for those who can get away with it. One analysis found the cost to mine one Bitcoin in Iran can be as low as $1,300, whereas that Bitcoin (at late 2024 prices) was worth $30,000–$40,000 on global markets. This 20- to 30-fold profit margin explains why the IRGC, and other actors are willing to risk illicit mining and ignore grid restrictions.[72]

112.   The energy intensity is staggering since mining a single Bitcoin token requires over 300 megawatt-hours of electricity – about as much power as 35,000 Iranian households consume in a day. Put another way, every Bitcoin produced by these farms effectively represents tens of thousands of homes knocked off the grid for a day. The regime's former energy minister Reza Ardakanian warned that cryptocurrency operations were estimated to be using up nearly 10% of Iran's total electricity generation by some counts.[73]

---

[71] *Iranian-Chinese Facility to Restart Bitcoin Mining After Blackouts*, Iranwire at https://iranwire.com/en/features/69354/

[72] Kia, Shahriar.

[73] *Id.*

59

113.    In January 2021, major cities including Tehran were hit with sudden power outages, spurring public outrage. Officials pointed to a surge in illegal crypto mining as a key culprit (alongside a drought that cut hydroelectric output). That spring, as blackouts continued ahead of the June elections, President Rouhani took the drastic step of banning all cryptocurrency mining for four months (May–Sept 2021) to alleviate the electricity shortfall. He noted that unlicensed miners were consuming enormous power and promised a crackdown.[74]

114.    During this period, Iran's peak electricity demand was around 60,000 MW; shutting down miners was expected to free up a few thousand megawatts and reduce the daily rationing of power. Indeed, global data showed a temporary dip in Iran's share of Bitcoin hashrate while the ban was in effect. But enforcement was patchy – especially against IRGC-linked farms – and blackouts persisted through the summer of 2021. The government acknowledged crypto mining as one factor, along with high temperatures and aging infrastructure, in what many dubbed "the summer of darkness."[75]

115.    In 2022, Iran's parliament quietly passed legislation allowing military bodies to establish their own private power plants and electricity lines. This gave the IRGC direct access to subsidized (and even previously public) electricity resources – infrastructure ostensibly meant for cities and industries – which could now be redirected to secretive crypto farms.[76]

116.     In late 2024, a cold snap led to natural gas shortages (many Iranian power plants burn gas), triggering electricity cuts in large cities. Again, officials implored that all licensed crypto farms shut off and insisted they had halted power to the legal mining centers. It was widely

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

believed that certain politically connected mines continued operating throughout. Notably, even after public appeals, investigators found some facilities – including those tied to the IRGC – drawing power during the grid's peak strain, their lights humming while neighborhoods nearby went dark. This pattern of uneven enforcement fueled popular anger and suspicion.[77]

117.    The government has often been reluctant to publicly admit how much state-linked crypto mining contributes to the outages. The official narrative typically emphasizes other causes (such as higher household consumption, drought affecting generation, or people running too many air conditioners). But the public and independent observers have connected the dots. By 2025, slogans and social media posts in Iran frequently railed against *"mafias"* or *"cartels"* stealing electricity. Even some regime lawmakers and ex-officials have criticized the indulgence of crypto mining, warning that it jeopardizes an already fragile grid.[78]

118.    In blackout-hit neighborhoods, families must deal with summer heat and winter cold without heating or cooling. Food spoils in refrigerators; water supply (dependent on electric pumps) can be interrupted. In July 2021, for instance, many Tehran residents found themselves stuck in elevators or stranded in traffic due to sudden power cuts. By 2024, outages were so frequent that people jokingly shared "load-shedding schedules" on social media to plan their day. There is widespread resentment that while citizens endure these hardships and are even asked to conserve energy, certain regime-backed facilities guzzle power nonstop. As one Iranian put it, *"We sit in the dark to keep the Bitcoin machines running."*[79]

---

[77] *Id.*

[78] *Id.*

[79] *Id.*

119.    The power cuts have inflicted billions in losses on Iran's economy. Small businesses, from bakeries to workshops, must shut during outages, losing income. Large industries like steel and cement have reported equipment damage and production delays. Iran's Bargh News (an energy industry outlet) estimated the total cost of power outages to the economy at over $25 billion annually – costs ultimately borne by society in the form of higher prices, lost jobs, and reduced services. Much of this damage is attributable to the persistent gap between supply and demand in electricity – a gap widened by the unaccounted drain of crypto mining.[80]

**The Mining Pool**

119.    In mineable cryptocurrencies, a "coinbase" is the number of coins that are generated from scratch and awarded to miners for mining every new block.

120.    Bitcoin are mineable, meaning that Bitcoin allows any user to contribute their computational power to securing the operation of the coin. The miners do this by collecting the most recent transactions that have taken place on the network, packaging them into blocks, securing these blocks with cryptographic hashes and adding them to the end of the blockchain.

121.    In exchange for the expenditure of electricity and the operation of specialized equipment, mining is incentivized by the Bitcoin network by including a special transaction in every new block that sends a certain amount of newly "mined," *i.e.* created coins to the person or organization that has mined that block. This transaction is called the generation transaction and the coins included in it are the coinbase of the block.

122.    The Iran-China Group operated a mining pool called LuBian and tagged itself as "lubian.com" in coinbase transactions, meaning that LuBian mined the block and received the reward.

---

[80] *Id.*

123.   As a result of its ties to the Iranian government, prior to the December 2020 hack, the Government concedes that LuBian was able to mine at least 23,738.17 Bitcoin in Iran which, pursuant to Iranian law, were required to be sold to the Central Bank of Iran.

124.   LuBian also accumulated at least another 116,271 Bitcoin in its wallets from mining activities, bringing its total reserve as of December 2020 to 127,271 Bitcoin - worth approximately $11.4 billion as of December 22, 2025. [81]

125.   On August 2, 2025, Arkham Intelligence ("Arkham") reported that "LuBian was a Chinese mining pool with facilities in China & Iran. Based on analysis of on-chain data, it appears that 127,426 Bitcoin was stolen from LuBian in December 2020, worth $3.5 billion at the time and now worth approximately $14.5 billion. Neither LuBian nor the hacker have publicly acknowledged the hack. Arkham is the first to report it."[82]

126.   Arkham further reported:

> "LuBian was one of the world's largest mining pools in 2020, controlling almost 6% of the Bitcoin network's total hash-rate as of May 2020. They appear to have been first hacked on December 28th, 2020 for over 90% of their BTC.
>
> Subsequently, on December 29th, around $6M of additional BTC & USDT was stolen from a Lubian address active on Bitcoin Omni layer.
>
> On the 31st, LuBian rotated their remaining funds to recovery wallets. Each hacker address received the OP_RETURN message, shown in the screenshots, in which LuBian asks the hacker to return their funds.

---

[81] Warp Data, a mining operation based in Laos that apparently also mined the lubian.com blockchain, submitted claim at ECF 64 in the Forfeiture case "asserting ownership of at least 47,680.03 BTC." The *Havlish* Judgment Creditors do not concede this claim has any validity, and have seen no documents - or any other evidence – supporting this claim other than Warp Data's own statements.

[82] Arkham Intelligence, Inc, *Arkham Uncovers $3.5 billion Heist – The Largest Ever*, on Aug. 2, 2025, at https://info.arkm.com/announcements/arkham-uncovers

LuBian spent 1.4 BTC across 1516 different transactions to send these messages, which suggests that this is not a spoof from another hacker who has brute-forced the private keys."[83]

127.    Arkham included the following screen shots that demonstrate LuBian's attempts to have the hacked Bitcoin returned to them:



128.    The identity of the hacker is unknown.

129.    Upon information and belief, including the fact that Iran and the IRGC continue to move Bitcoin through the UK at present, the Iran-China Group still operates the Bitcoin mining farm in Rafsanjan, Kerman Province, Iran.

**COUNT ONE**

**TRIA**

130.    The above paragraphs are hereby incorporated as if fully set forth herein.

131.    TRIA states in that:

---

[83] *Id.*

> *Notwithstanding any other provision of law,* and except as provided in subsection (b), in every case in which a person has obtained a *judgment against a terrorist party* on a claim based upon an act of terrorism, or for which a terrorist party is not immune under 28 U.S.C. § 1605(a)(7) [now 28. U.S.C. § 1605A], the blocked assets of that terrorist party *including the blocked assets of any agency or instrumentality of that terrorist party* shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* § 201(a) (*emphasis and bracket added*).

132.   The Second Circuit has "found it clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment." *Havlish v. the Taliban*, 152 F.4th 339, 360 (2d Cir. 2025) <u>citing</u> *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010).

133.   The Second Circuit held in *Havlish* and *Weinstein* that "the phrase notwithstanding any provision of law" makes plain that the force of § 201(a) of TRIA "extends everywhere" over the FSIA including its jurisdictional, attachment, and execution provisions. *Havlish* at 360*; Weinstein* at 49.

134.   The *Havlish* Judgment Creditors hold final, enforceable judgments for compensatory damages entered pursuant to the anti-terrorism exception to foreign sovereign immunity found at 28 U.S.C. § 1605A.

135.   The judgment for liability and damages is against a terrorist party, Iran.

136.   The Blocked Cryptocurrency subject to the forfeiture proceeding is currently in possession of the United States, the Garnishee.

137.   The Blocked Cryptocurrency was blocked by operation of E.O. 13599 issued by President Obama when it came into the United States.

65

138.     The blocked assets of any terrorist party, including an agency and instrumentality of that terrorist party, such as the Iran-China Group, shall be subject to execution, or attachment in aid of execution by the *Havlish* Judgment Creditors.

139.     Iran has access to this asset prior to the hack that placed the Blocked Cryptocurrency into the possession of the Unites States.

140.     The status an "agency and instrumentality" of a terrorist party, such as Iran here, is determined through the test articulated by the Second Circuit in *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016).

141.     *Kirschenbaum* defined three independent ways in which the Iran-China Group qualifies as an agency or instrumentality of a terrorist party under TRIA. First, the Iran-China Group will be an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished[.]" *Kirschenbaum*, 830 F.3d at 135. Second, the Iran-China Group will be an agency or instrumentality of the Iranian Judgment Debtors if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.* Or third, the Iran-China Group will be an agency or instrumentality if it is "owned, controlled, or directed by the terrorist party." *Id.*

142.     The Iran-China Group meets each of the three independent factors established by the *Kirschenbaum* test – even though the *Havlish* Judgment Creditors are only required to meet one.

143.     Specifically, the Iran-China Group is "a means through which a material function of the terrorist party is accomplished," namely, the mining of the Bitcoin by Iran, including in whole or in part the Blocked Cryptocurrency in this forfeiture case, for sale to the Central Bank of

66

Iran for use as an untraceable currency with the specific intent to evade U.S. sanctions related to international terrorism, and other malign activities.

144.    The Iran-China Group is also an agency or instrumentality of Iran because it "provides material services to, on behalf of, or in support of" Iran, namely, the mining of the Bitcoin, including in whole or in part the Blocked Cryptocurrency in this forfeiture case, for sale to the Central Bank of Iran for use as an untraceable currency with the specific intent to evade U.S. sanctions related to international terrorism, and other malign activities.

145.    Thirdly, the Iran-China Group is also an agency or instrumentality of Iran because it is "owned, controlled, or directed" by Iran.

146.    Therefore, notwithstanding any other provision of law, the Blocked Cryptocurrency, some or all of which was mined in Iran, shall be made available to the *Havlish* Judgment Creditors for attachment and execution in partial satisfaction of their compensatory damages judgments.

147.    By operation of TRIA, no other claimant holds a superior claim to the Blocked Cryptocurrency subject to forfeiture than the *Havlish* Judgment Creditors.

## SECOND COUNT

## TURNOVER PURSUANT TO NY CPLR 5225 and 5227

148.    The above paragraphs are hereby incorporated as if fully set forth herein.

149.    Rule 69(a)(1), Fed.R.Civ.P., provides that, in an instance where a judgment creditor, such as the *Havlish* Judgment Creditors, seeks to enforce a money judgment, "[t]he procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed.R.Civ.P. 69(a)(1).

150.     Civil Practice Law and Rules 5225 (b) of the New York Code provides, in relevant part, as follows:

> (b)  Property not in the possession of judgment debtor.  Upon a special proceeding commenced by the judgment creditor, against a person in custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as sufficient to satisfy the judgment, to the judgment creditor and, if the amount so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

NY CPLR 5225 (b).

151.     Litigants in federal court need not commence a "special proceeding" as contemplated by CPLR article 52, because Rule 2, Fed.R.Civ.P., establishes that there is only one form of action in federal courts – the civil action.  See *Northern Mariana Islands v. Millard*, 287 F.R.D. 204, 208 (S.D.N.Y. 2012) citing *Saregama India, Ltd. v. Mosley*, 2012 WL 955520 (S.D.N.Y. Mar. 20, 2012).

152.     The United States is "a person in custody of money or other personal property in which the [Iranian Judgment Debtors have] an interest," specifically the Blocked Cryptocurrency subject to forfeiture.

153.     Civil Practice Law and Rules 5227 of the New York Code provides, in relevant part, as follows:

> Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor. Costs of the proceeding shall not be awarded against a person who did not dispute the indebtedness.

NY CPLR 5227.

154.    The United States, as Garnishee, is a "person who it is shown is or will become indebted to the judgment debtor," specifically by the Blocked Cryptocurrency subject to forfeiture, some or all of which was mined in Iran.

155.    This Court has personal jurisdiction over the United States as Garnishee holding the Blocked Cryptocurrency, some or all of which was mined in Iran.

156.    Therefore, this Court is empowered to order the United States as Garnishee to turnover the Blocked Cryptocurrency, some or all of which was mined in Iran, to the *Havlish* Judgment Creditors.

**PRAYER FOR RELIEF**

**WHEREFORE**, the *Havlish* Judgment Creditors respectfully request that this Honorable Court enter an Order for Turnover to the *Havlish* Judgment Creditors of the Blocked Cryptocurrency in partial satisfaction of their outstanding compensatory damages judgments.

Respectfully Submitted,

Date:   June 26, 2026

*/s/* Douglass A. Mitchell
Douglass A. Mitchell (NV Bar No. 3775)
Pro Hac Vice Pending
MITCHELL ALLYN, LTD.
1000 N. Green Valley Pkwy, Suite 440-575
Henderson, NV 89074
Tel: (702) 350-1208
dmitchell@mitchellallyn.com

*Attorneys for the* Havlish *Judgment Creditors*

Andrew C. Levitt (New York Bar No. 2734465)
O'HARE PARNAGIAN LLP
20 Vesey Street, Suite 300
New York, NY  10007
(212) 425-1401

*Co-Counsel for Ray Judgment Creditors Harley DiNardo; Harley DiNardo as Personal Representative of the Estate of Esterina DiNardo a/k/a Ester DiNardo; Pio DiNardo; Andrew Economos; Andrew Economos and Olga Valinotti as Co-Personal Representatives of the Estate of Leon Economos; Olga Valinotti; Constance Finnicum; George Gabrielle a/k/a Gabe Gabrielle; Mary Ellen Murach; Mary Ellen Murach, as Personal Representative of the Estate of Edward John Murach; Richard J. Murach; and Katharine Tynion*